Cynthia A. **RICHARDSON,**
Plaintiff–Appellant,

v.

**NEW YORK STATE DEPARTMENT OF CORRECTIONAL SERVICE,** Auburn Correctional Facility, Defendant–Appellee.

**Docket No. 98–7110.**

United States Court of Appeals,
Second Circuit.

Argued Sept. 24, 1998.

Decided June 16, 1999.

428

432

David E. Peebles, Syracuse, N.Y. (Hancock & Estabrook, Syracuse, NY, of counsel), for Appellant.

Marlene O. Tuczinski, Assistant Attorney General, State of New York, Albany, N.Y. (Dennis C. Vacco, Attorney General of New York, Peter H. Schiff, Deputy Solicitor General, Peter G. Crary, Assistant Attorney General, State of New York, Albany, NY, of counsel), for Appellee.

Before: WINTER, Chief Judge, MESKILL and LEVAL, Circuit Judges.

Chief Judge WINTER concurs in part and dissents in part in a separate opinion.

MESKILL, Circuit Judge:

Plaintiff-appellant Cynthia A. Richardson (Richardson) appeals from an order of the United States District Court for the Northern District of New York, Scullin, J., granting summary judgment to defendant-appellee the New York State Department of Correctional Service (DOCS). Richardson, an African–American female and former DOCS employee, brought claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2(a)(1), 3(a), and New York Exec. L. § 290 *et seq.,* alleging that she was subjected to a racially hostile work environment at the DOCS facilities where she worked and that she was retaliated against when she complained about and filed a lawsuit to remedy that discrimination. In granting summary judgment on Richardson's Title VII hostile environment claim, the district court concluded (1) that Richardson's allegations, even if true, were as a matter of law insufficient to establish an actionable hostile environment, and (2) that even if the environment in question were sufficiently hostile, no basis existed for imputing that environment to her employer. *Richardson v. State of New York,* 1997 WL 797527, at *5–6 (N.D.N.Y. Dec. 22, 1997). The district court also granted DOCS summary judgment on Richardson's Title VII retaliation claim, determining that Richardson failed to present evidence sufficient to establish that DOCS took adverse employment action against her as a result of her having engaged in protected activity. *Id.* at *7. Finally, the district court granted DOCS's motion to dismiss Richardson's state law claims on Eleventh Amendment grounds, over Richardson's objection that DOCS waived its Eleventh Amendment immunity when it failed to raise the defense in its answer. *Id.* at *1 n. 1. We affirm the district court's ruling on Richardson's state law claims and on two aspects of her Title VII retaliation claims, but we vacate and remand on the Title VII hostile work environment claim and on two aspects of her retaliation claim.

## BACKGROUND

Richardson was employed by DOCS from 1988 until 1994 and worked at two separate DOCS facilities during that time period. For the purposes of the summary judgment motion, both DOCS and the district court accepted Richardson's factual allegations as true. Her allegations concerning each facility are described in turn below.

### A. The Auburn Correctional Facility

Richardson was hired by DOCS in December 1988 as a calculations clerk at the Auburn Correctional Facility (ACF) and worked there until July 1992 when she took a medical leave of absence. Richardson alleges that while at ACF approximately ten incidents combined to create a racially hostile work environment that had "mental, emotional and physical" effects on her and that ultimately culminated in the medical leave she commenced on July 16, 1992.

The first incident occurred in February 1989, when Richardson attended a DOCS training session on stress management. At that session, the instructor, Father James Enright, offered a hypothetical (presumably as an example of a stressful situation) that Richardson deemed racially insensitive because it featured a local African–American family and was set at a local bar frequented by African–Americans. When Richardson objected to the example, Father Enright said something to the effect that "okay well take the same situation, different setting, three black guys." Richardson's complaints led to two meetings with supervisors to discuss the incident and Richardson ultimately received a written apology from Father Enright.

The second incident occurred in March 1990 when a supervisor, Mary Cuff, stated in Richardson's presence that certain African–Americans who were suspects in a recent murder looked like "apes or baboons." Richardson's immediate supervisor, Debra Gardner, was present and laughed at the comment. The third inci-

dent occurred on Halloween in 1990 when a co-worker, Rita Campagnola, said to Richardson and others something to the effect that "all you spooks have a nice Halloween." Richardson perceived that the word "spooks" was used as a derogatory term for Black people, and recalled that her co-workers all turned to look at her when the remark was made. The fourth and fifth incidents occurred during a training seminar in November 1990 when Richardson's co-worker, Bob Greene, repeatedly made comments concerning "Arnold Schwarzenigger," and another co-worker commented that an unidentified Caucasian had "some nerve bringing his brown-skinned wife to the party."

Richardson's complaints about these incidents prompted the DOCS Affirmative Action Office (the "DOCS AAO") to commence an investigation in late 1990. To this end, DOCS AAO employee Denia Van Houter (Van Houter) looked into the "spooks," "Arnold Schwarzenigger" and "brown-skinned wife" incidents. After interviewing eight individuals, Van Houter prepared a written report that concluded that the incidents in question occurred as Richardson alleged, and that although "the intent of the comments" appeared "to be for humorous, rather than malicious purposes," "[a]ll interviewees except complainant[ ] appears to lack cultural/racial sensitivity."

Van Houter further noted that at her December 6, 1990 visit to ACF she was "verbally attached [sic] simply because" she "was a Black female." When asked at her deposition about the experience, Van Houter recalled telling her supervisor "I had just been through a meeting that reminded me of what it must have been like for blacks in the south who might have been lynched. I felt it was like a lynching meeting that I had just been through."

Van Houter recommended that DOCS institute a "Cultural Awareness Training" program specifically tailored for the ACF staff, and her suggestion was endorsed by

the Superintendent of ACF, Hans Walker, and his deputy, Ronald Nelson. Van Houter noted that if it were approved she could produce such a program within 60 days. No facility-specific program was ever held and no program of any kind was instituted until late 1993 or early 1994— some three years after Van Houter's recommendation—when a system-wide program was commenced in response to a court order in a different case.

In the meantime, additional incidents occurred. The sixth overall incident occurred in May 1991 when Cuff commented on pictures of African–American inmates by saying that "black people are so dark you can't see them anyway." Richardson did not report this incident out of fear that her co-workers would stop talking to her as they had done after she complained of prior incidents.

The seventh incident occurred in October 1991 when Richardson overheard an unidentified co-worker comment, referring to Richardson, that he didn't know that "there were any light-skinned niggers" working at ACF. Richardson reported this comment to the DOCS AAO as well as to her supervisor. The record does not indicate that any action was taken in response to the complaint.

The eighth incident occurred in February 1992 when an unidentified co-worker called Richardson a "nigger."[1] The ninth incident occurred during an April 1992 training session when, in response to an instructor's question on how to address inmates a co-worker explained that he referred to them as "Buckwheat." Richardson alleges that the instructors and other attendees laughed at the comment and that, despite her protests, the instructors failed to advise the class that use of the term was derogatory and could in fact be dangerous. Richardson complained about

this incident in a May 1992 letter to DOCS superintendent Thomas Coughlin, who responded with a letter in which he promised to prevent recurrence and assured Richardson that instructors were being reminded of the importance of sensitivity in all training programs. No disciplinary action was taken against the co-worker or the supervisors who ran the training session, nor were the participants from that session advised that the term was derogatory and possibly dangerous.

The tenth and final incident occurred in June 1992 when two co-workers distributed a copy of a racially insensitive joke, titled "Farmer's Dayvorce," which included, among other things, use of the word "nigger." Richardson complained to ACF Superintendent Walker and Deputy Nelson and DOCS immediately responded by firing the two workers who distributed the joke. Ultimately the workers were reinstated, but only after their union successfully challenged the terminations in administrative grievance proceedings; one of the workers was promoted to a supervisory position upon her return. In further response, Superintendent Walker wrote a memorandum, which was attached to all ACF employees' July 9, 1992 paychecks, in which he plainly stated that DOCS prohibited racially insensitive comments and would punish those employees who violated that policy.

Richardson claims that emotional stress caused by racial harassment forced her to take the leave of absence in July 1992. While on that leave in December 1992, Richardson filed discrimination charges with the New York State Division of Human Rights (N.Y.SDHR) and the Equal Employment Opportunity Commission (EEOC). Richardson returned to work in August 1993 at which time, she contends, the discrimination continued.

1. Although Richardson failed either to support this allegation in her affidavit in opposition to DOCS's summary judgment motion or mention it in her appellate brief, the allegation was in her supplemental complaint, was not refuted by DOCS and was addressed by the district court. As such we will consider it among those incidents forming the basis for Richardson's purported hostile environment claim.

## B. *The Cayuga Correctional Facility*

When Richardson returned from her leave of absence on August 15, 1993, she was assigned to work as a stores clerk at the commissary of a different prison, the Cayuga Correctional Facility (CCF). In contrast to her ACF position, Richardson's new CCF position brought her into close proximity to the prison population. Richardson contends that at CCF she was again harassed because of her race, and furthermore was retaliated against for having complained about the discrimination she encountered at ACF. For the most part, both DOCS and the district court accepted Richardson's CCF factual allegations as true for the purposes of the summary judgment motion and they are described below.

First, in August 1993, one of Richardson's supervisors, James Mahunik, allegedly divulged Richardson's home address to inmates and told an inmate to be wary of Richardson because she had caused a lot of problems and had gotten people fired at ACF. Richardson informed a program coordinator at CCF and the DOCS AAO about this incident. Almost a year later, in September 1994, co-worker Carol Gamba said, in the presence of Richardson and two supervisors, that "some people will do anything for money," apparently referring to Richardson's lawsuit. Richardson complained about this incident and DOCS investigated and concluded that Richardson had overheard only part of a conversation that was not about her. Furthermore, two co-workers called Richardson "stupid" and "ignorant" at least fifteen to twenty times during this period.

In October 1994, Richardson found horse manure in her parking spot, although the lot was fenced in and ordinarily would not have horse traffic. Richardson did not report this incident to anyone.

After work on April 12, 1995, while riding a commuter bus along with co-workers and a supervisor, Richardson was struck in the head by a rubber band fired by a co-worker, Gamba. Richardson reported this incident to the CCF Superintendent who declined to investigate because the incident did not occur in the workplace. On April 19, 1995, Richardson's counsel notified DOCS that plaintiff claimed to be experiencing "ongoing racial harassment" and requested that steps be taken to halt it.

Deposition notices in Richardson's lawsuit were served in early June, 1995. The following incidents all occurred in June 1995: Richardson's car was scratched in the parking lot; she found hair in her food on four occasions; she overheard co-workers inquire why she "wouldn't just go work somewhere else;" she had other co-workers tell her that "we are not the crazy ones here;" she learned that a co-worker had been warned by other co-workers not to talk to Richardson because she took notes; her file cabinets were kept locked, in contrast to prior policy, which interfered with her ability to do her work; and she was not given telephone messages intended for her. When Richardson met with the Superintendent to discuss her concerns, he expressed the view that since many CCF employees lived near or had relatives at ACF, it might be difficult to "change their attitudes."

Richardson also alleged that a co-worker made a "disparaging comment" about Native Americans; that Gamba stated that all of the Black inmates look alike; and that Quill remarked that Jewish people "like to hold on to their money." Richardson could not, however, pinpoint when these incidents occurred.

By July 1995 Richardson felt she had "no alternative" but to take a medical leave of absence "in order to avoid suffering further emotional distress and mental anguish." Richardson provided medical documentation to justify her absence for the period from July 24, 1995 through January 1, 1996, but failed to respond to DOCS's request that she update the documentation to justify her absence from January 2, 1996 forward. In light of her failure to

provide a satisfactory explanation for her unexcused absence, DOCS, relying on a provision of the governing collective bargaining agreement covering unexcused absences, deemed Richardson to have resigned as of January 15, 1996. Richardson claims that DOCS's actions amounted to a retaliatory termination undertaken in retribution for her complaints about the discrimination she suffered.

Richardson filed this lawsuit on August 22, 1994 and filed a supplemental complaint in June 1996. After discovery, DOCS moved for summary judgment dismissing all claims and Richardson now appeals from the district court's judgment granting that motion.

## DISCUSSION

 We review the district court's grant of summary judgment *de novo*. *Distasio v. Perkin Elmer Corp.*, 157 F.3d 55, 61 (2d Cir.1998). Summary judgment is properly granted only when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). When considering a motion for summary judgment the court must draw all factual inferences and resolve all ambiguities in favor of the nonmoving party. *Torres v. Pisano*, 116 F.3d 625, 630 (2d Cir.), *cert. denied,* —— U.S. ——, 118 S.Ct. 563, 139 L.Ed.2d 404 (1997).

### A. *Title VII—Hostile Environment Racial Harassment*

 Title VII makes it unlawful for an employer to discriminate against any individual with respect to the "compensation,

terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). Here, Richardson proceeds under a "hostile work environment" theory, which requires her to establish (1) that the "workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of [her] work environment, and (2) that a specific basis exists for imputing the conduct that created the hostile environment to the employer." *Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir. 1997) (citation and internal quotation omitted); *Torres,* 116 F.3d at 630–31.

### 1. *Hostile Environment*

 In *Harris v. Forklift Systems,* 510 U.S. 17, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993), a sexual harassment case,[2] the Supreme Court held that a Title VII hostile environment claim will succeed only where the conduct at issue is so "severe or pervasive" as to create an " 'objectively' hostile or abusive work environment," and where the victim "subjectively perceive[s] the environment to be abusive." *Id.* at 21–22, 114 S.Ct. 367. Because there is no dispute that Richardson subjectively perceived her environment to be hostile and abusive, the question here reduces to whether the environment was "objectively" hostile. Richardson's allegations should thus be evaluated to determine whether a reasonable person who is the target of discrimination would find the working conditions so severe or pervasive as to alter the terms and conditions of employment for the worse.[3] *See id.* at 21, 114 S.Ct. 367.

---

2. Generally, the same standards apply to both race-based and sex-based hostile environment claims. *See Torres,* 116 F.3d at 630 (noting that the standards for evaluating hostile environment claims are the same whether the alleged discrimination is based on race or sex); *Snell v. Suffolk County,* 782 F.2d 1094, 1103 (2d Cir.1986) (applying sexual harassment case law in case involving Title VII racial harassment).

3. In adopting this standard as the proper one under Title VII, we reject the view of those courts that look to the perspective of the particular ethnic or gender group, *e. g.,* a "reasonable African–American" or a "reasonable Jew." *See, e. g., Stingley v. Arizona,* 796 F.Supp. 424, 428–29 (D.Ariz.1992); *Harris v. International Paper Co.,* 765 F.Supp. 1509, 1516 & n. 12 (D.Me.), *vacated in part,* 765 F.Supp. 1529 (D.Me.1991). While we recognize that there is dicta in this circuit support-

■ In *Harris*, the Supreme Court established a non-exclusive list of factors relevant in determining whether a given workplace is permeated with discrimination so "severe or pervasive" as to support a Title VII claim. 510 U.S. at 23, 114 S.Ct. 367. These include (1) the frequency of the discriminatory conduct; (2) its severity; (3) whether the conduct was physically threatening or humiliating, or a "mere offensive utterance;" (4) whether the conduct unreasonably interfered with plaintiff's work; and (5) what psychological harm, if any, resulted. *Id.* at 23, 114 S.Ct. 367; *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 767–68 (2d Cir.1998).

■ We noted in *Schwapp* that in order "[f]or racist comments, slurs, and jokes to constitute a hostile work environment, there must be 'more than a few isolated incidents of racial enmity.'" *Schwapp*, 118 F.3d at 110 (quoting *Snell v. Suffolk County*, 782 F.2d 1094, 1103 (2d Cir.1986)). Isolated incidents or episodic conduct will not support a hostile work environment claim. *See Kotcher v. Rosa and Sullivan Appliance Ctr.*, 957 F.2d 59, 62 (2d Cir. 1992) ("The incidents must be repeated and continuous; isolated acts or occasional episodes will not merit relief.").

■ Although "isolated, minor episodes of harassment do not merit relief under Title VII," *Torres*, 116 F.3d at 631, "even a single episode of harassment, if severe enough, can establish a hostile work environment," *id.* n. 4. Our law is clear, for example, that "even a single incident of sexual assault sufficiently alters the conditions of the victim's employment and clearly creates an abusive work environment" under Title VII. *Tomka v. Seiler Corp.*, 66

F.3d 1295, 1305 (2d Cir.1995); *see Torres*, 116 F.3d at 631.

■ We are cautioned to consider the totality of the circumstances, *see Schwapp*, 118 F.3d at 111 (citing *Harris*, 510 U.S. at 23, 114 S.Ct. 367), and to evaluate the "quantity, frequency, and severity" of the incidents, *see id.* (citing *Vore v. Indiana Bell Tel. Co.*, 32 F.3d 1161, 1164 (7th Cir.1994)). The factors must be considered "cumulatively," so that we may "obtain a realistic view of the work environment." *Id.* (quoting *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 444 (7th Cir.1994)).

■ As the Seventh Circuit has observed, "the existence of racial harassment in a hostile work environment involves an application of facts (the specific discriminatory conditions alleged by the plaintiff) to law (the standards governing the existence of racial harassment and hostile work environment discrimination)." *Rodgers v. Western–Southern Life Ins. Co.*, 12 F.3d 668, 674 (7th Cir.1993). The question may thus be characterized as a "mixed question of law and fact" because it involves "the application of a legal standard to a particular set of facts". *See GAF Corp. v. Heyman*, 724 F.2d 727, 737 (2d Cir.1983). Such mixed questions are "especially well-suited for jury determination and summary judgment may be granted only when reasonable minds could not differ on the issue." *Mendell v. Greenberg*, 927 F.2d 667, 673 (2d Cir.1990) (discussing topic in context of "materiality" determinations under securities laws) (citing *TSC Indus. v. Northway*, 426 U.S. 438, 450, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976)). Although such questions may be ripe for summary

ing such an approach, *see Torres v. Pisano*, 116 F.3d 625, 632–33 (2d Cir.1997), we believe that examining hostile environment claims from the perspective of a "reasonable person who is the target of racially or ethnically oriented remarks" is the proper approach. First, Title VII seeks to protect those that are the targets of such conduct, and it is their perspective, not that of bystanders or the speaker, that is pertinent. Second, this stan-

dard makes clear that triers of fact are not to determine whether some ethnic or gender groups are more thin-skinned than others. Such an inquiry would at best concern largely indeterminate and fluid matters varying according to location, time, and current events. It might also lead to evidence, argument, and deliberations regarding supposed group characteristics and to undesirable, even ugly, jury and courtroom scenes.

adjudication where the underlying facts are undisputed, that the facts are undisputed does not automatically mandate summary judgment; rather, summary judgment is appropriate only where application of the law to those undisputed facts will reasonably support only one ultimate conclusion. *See* Fed.R.Civ.P. 56(c) (dictating that summary judgment must be granted where "there is no genuine issue as to any material fact *and* . . . the moving party is entitled to a judgment as a matter of law") (emphasis added); *see This is Me v. Taylor*, 157 F.3d 139, 142 (2d Cir.1998) (reflecting that summary judgment is appropriate only if the evidence is such that a reasonable juror would be "compelled to accept the view of the moving party"); *Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 907 (2d Cir.1997) ("Summary judgment is designed to pierce the pleadings to flush out those cases that are predestined to result in a directed verdict.").

### a. *The ACF Environment*

In evaluating DOCS's motion for summary judgment the district court found as a matter of law that Richardson's allegations were insufficient to establish an actionable hostile working environment. The district court generally focused on whether the incidents Richardson complained of were "pervasive" and concluded that the slurs and comments alleged "cannot be said to be commonplace, daily, continuous, or a steady barrage as is required." *Richardson*, 1997 WL 797527, at *4. Rather, the court concluded, "the alleged ACF incidents were infrequent, isolated, and sporadic" and thus insufficient. The court reached this conclusion by dividing the number of incidents alleged over the relevant time period, finding that the "time gaps" between these incidents "average[d] 6 months," and contrasting that figure with the number of incidents alleged in cases upholding a claim of hostile work environment. *Id.* As to the severity of the conduct, the district court merely noted that "not one of the comments or slurs alleged to have occurred was physically

threatening." *Id.* at *5. The district court reached its ultimate conclusion—that no reasonable juror could find the environment described by Richardson objectively discriminatory—"regardless of whether the objective standard to be applied is that of an African–American female, an African–American, or simply a 'reasonable person.'" *Id.* n. 10.

In defense of the district court's determination, DOCS principally urges that Richardson's ACF claim must fail because the harassment she endured was neither as severe nor as pervasive as that found actionable in other cases decided by this Court, most particularly *Torres* and *Schwapp*.

In *Schwapp*, the plaintiff was the first African–American police officer hired by the defendant town and was the only African–American police officer employed there during the entire twenty-month duration of his employment. His hostile environment claim consisted of a total of twelve incidents—ten that occurred while he was employed by the town, and another two that occurred before he arrived but about which he was made aware during his employment. Of the twelve, four were made in his presence and two of those involved use of the word "nigger." In perhaps the most significant incident, when Schwapp spoke with a supervisor about the harassment he perceived, the supervisor told Schwapp that he "had to understand that . . . at one time all the crimes in Avon were committed by blacks" and that he should "accept the fact that he was working with racists and not be 'so sensitive.'" 118 F.3d at 112.

In reversing the district court's grant of summary judgment for the defendant we did not exclusively focus on either the frequency of the incidents (twelve in twenty months), or on the severity of any one incident (including the epithets used or the force of any one incident on Schwapp's experience). Instead, we viewed the totality of the circumstances and concluded

that we could not "say as a matter of law that the[ ] incidents could not amount to a claim of hostile work environment." *Id.* at 112.

The *Torres* plaintiff complained that her supervisor created a hostile work environment by making crude sexual comments and overtures and by insulting her race. Although we ultimately affirmed the district court's grant of summary judgment (on the ground that the employer-defendant could not be held liable for its employee's behavior), we held that the plaintiff had produced sufficient evidence to send to a jury her claim that her work environment was hostile and actionable under Title VII. We held that the conduct about which Torres complained—"constant" harassing conduct in which her supervisor referred to her as a "dumb cunt" and a "dumb spic," commented on her anatomy, made sexual innuendos and graphic sexual overtures, and told her to "stay home, go on welfare and collect food stamps like other spics"—made out a strong prima facie case of hostile work environment harassment. 116 F.3d at 632–33. We "emphatically" rejected the defendant's argument that Torres had alleged no more than "a handful of incidents of inappropriate behavior that, as a matter of law, were not so pervasive" as to constitute hostile work environment harassment. *Id.* at 631. Although we agreed with the principle that "isolated, minor episodes of harassment do not merit relief under Title VII," *id.*, we observed that "the fact that the law requires harassment to be severe or pervasive before it can be actionable does not mean that employers are free from liability in all but the most egregious of cases." *Torres*, 116 F.3d at 631. Rather, we noted that the " 'appalling conduct' alleged in prior cases should not be taken to 'mark the boundary of what is actionable.' " *Id.* (quoting *Harris*, 510 U.S. at 22, 114 S.Ct. 367). We summarized that "whenever the harassment is of such quality or quantity that a reasonable employee would find the conditions of her employment altered for the worse, it is actionable

under Title VII, so long as the employee subjectively experienced a hostile work environment." *Id.* at 632.

DOCS may be correct that the conduct about which Richardson complains is neither as pervasive nor as severe as that seen in *Torres* and *Schwapp* or other cases. But DOCS errs when it assumes that those cases establish a baseline. "[T]here is neither a threshold 'magic number' of harassing incidents that gives rise, without more, to liability as a matter of law, nor a number of incidents below which a plaintiff fails as a matter of law to state a claim." *Rodgers*, 12 F.3d at 674; *see Harris*, 510 U.S. at 22, 114 S.Ct. 367 (noting that hostile environment analysis "is not, and by its nature cannot be, a mathematically precise test").

Here, a reasonable person could find her working conditions altered for the worse if, over the course of her three and one-half year employment: one of her supervisors referred to Blacks as "apes or baboons" and stated that African–Americans are "so dark you cannot see them anyway," one co-worker referred to her as a "light-skinned nigger," another called her "nigger," yet another went out of his way on one occasion to use the word nigger in her presence, others circulated a joke that disparaged Blacks and referred to them as "niggers," while still others used the terms "spooks" and "Buckwheats" to refer to African–Americans. *See Rodgers*, 12 F.3d at 675 ("Perhaps no single act can more quickly 'alter the conditions of employment and create an abusive working environment' than the use of an unambiguously racial epithet such as 'nigger' by a supervisor in the presence of his subordinates."). Reasonable jurors may well disagree about whether these incidents would negatively alter the working conditions of a reasonable employee. But the potential for such disagreement renders summary judgment inappropriate.

We also note that the district court discounted the Father Enright and "spooks"

incidents because "to infer racial animus" from those incidents "would require drawing inference upon inference." *Richardson*, 1997 WL 797527, at *5. On this motion for summary judgment, however, Richardson, the non-moving party, was entitled to the benefit of the very inferences the district court rejected. Because a reasonable juror could infer that the comments in question were racially hostile, the district court should have considered those allegations in that light when it evaluated the sufficiency of Richardson's hostile environment claim.

▪ Further, the district court focused almost exclusively on the "pervasiveness" of the harassment about which Richardson complained, noting with regard to its severity only that "not one of the comments or slurs alleged to have occurred was physically threatening." *Richardson*, 1997 WL 797527, at *5 n. 10. To be sure, a factor to consider in evaluating whether an environment is actionable is whether the conduct complained of was physically threatening or humiliating or merely an offensive utterance. *Harris*, 510 U.S. at 23, 114 S.Ct. 367. But as the Supreme Court explained in *Harris*, a work environment may be actionable if the conduct there is *either* so severe *or* so pervasive as to alter the working conditions of a reasonable employee. *Id.* From this follows the proposition that although "isolated, minor episodes of harassment do not merit relief under Title VII," *Torres*, 116 F.3d at 631, "even a single episode of harassment, if severe enough, can establish a hostile work environment," *id.* n. 4 (citing *Tomka*, 66 F.3d at 1305). Richardson's physical well being was never directly threatened at ACF; but a plaintiff need not endure threatened or actual physical assault before a reasonable factfinder could conclude that she endured "severe" harassment within the meaning of Title VII.

A factfinder may well conclude that the ACF environment was not so objectionable as to alter negatively the terms and conditions of a reasonable person's employment.

We cannot, however, say that the record evidence compels only that result. Accordingly, we hold that the district court erred when it concluded as a matter of law that the ACF environment was not hostile within the meaning of Title VII case law.

#### b. *The CCF Environment*

▪ In contrast to our conclusion about ACF, we agree with the district court's conclusion that Richardson's allegations were insufficient as a matter of law to establish that an objectively hostile working environment existed at CCF. Of the fifteen incidents about which Richardson complains, only three have any racial overtones whatsoever, and these—that one co-worker made a disparaging comment about Native Americans, that another once said that all of the Black inmates looked alike, and that a third once made a remark that Jewish people "like to hold on to their money"—are isolated, mild, and cannot, under any objective standard, suffice to create a hostile working environment. Indeed, only one involves Richardson's protected racial category. The balance may reflect that Richardson was not liked by her CCF co-workers and may be relevant to her retaliation claim, which is discussed below. But to sustain a Title VII hostile environment claim Richardson must show more—she must produce evidence that she was discriminated against because of her race, and this she has not done. *Carrero v. New York City Housing Authority*, 890 F.2d 569, 580 (2d Cir.1989) (reiterating that the conduct complained of must have been prompted by victim's status).

#### 2. *Employer Liability*

The district court reasoned additionally that even if the ACF environment was sufficiently hostile to support a claim, summary judgment still would have been appropriate because Richardson failed to establish the second element of her claim— *i.e.*, that a specific basis exists for imputing the conduct that created the hostile environment to the employer. *Richardson*,

1997 WL 797527, at *6; *see Schwapp,* 118 F.3d at 110; *Torres,* 116 F.3d at 633.

The Supreme Court recently held that an employer is presumed absolutely liable in cases where the harassment is perpetrated by the victim's supervisor, although employers may interpose an affirmative defense to rebut that presumption. *Burlington Industries v. Ellerth,* 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998); *Faragher v. City of Boca Raton,* 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998). In contrast, if the harasser is the victim's co-worker, the employer will be liable only if it is negligent, that is, if it either "provided no reasonable avenue for complaint or knew of the harassment but did nothing about it." *Murray v. New York Univ. College of Dentistry,* 57 F.3d 243, 249 (2d Cir.1995) (citation omitted); *see Faragher,* 118 S.Ct. at 2289 (noting general agreement among circuits that negligence standard governs employer liability for co-worker harassment); *Kracunas v. Iona College,* 119 F.3d 80, 89 (2d Cir.1997) (holding that employer may be liable for harassment of nonsupervisory personnel if it "failed to provide a reasonable avenue for complaint or if it knew, or in the exercise of reasonable care should have known, about the harassment yet failed to take appropriate remedial action"); 29 C.F.R § 1604.11(d) (1998) (holding employers liable for co-worker harassment if "the employer (or its agents or supervisory employees) knows or should have known of the conduct, unless it can show that it took immediate and appropriate corrective action").

Of the twelve ACF incidents about which Richardson complains, ten were committed by co-workers rather than supervisors. Of these, Richardson reported all but one to either a supervisor, the DOCS AAO, or both, and DOCS does not dispute that it knew about them. DOCS thus will be liable for any hostile work environment created by Richardson's co-workers unless it can show that it took immediate and appropriate remedial ac-

tion. *Kracunas,* 119 F.3d at 88; *see Murray,* 57 F.3d at 249.

"If the evidence creates an issue of fact as to whether an employer's action is effectively remedial and prompt, summary judgment is inappropriate." *Gallagher v. Delaney,* 139 F.3d 338, 348 (2d Cir.1998); *see, e. g., Kracunas,* 119 F.3d at 90 (holding that district court erred in concluding that employer's response, taken some four to six months after employer learned of allegations, was appropriate as a matter of law) (citing *Snell,* 782 F.2d at 1104); *Kotcher,* 957 F.2d at 64 (remanding post-bench trial judgment for additional findings as to reasonableness of employer's response to harassment, and noting that claims "must be evaluated in light of all the circumstances," including evidence "tending to indicate" that supervisors "at least tolerated" their subordinate's unlawful harassing conduct).

Here, the district court concluded that Richardson had not established that DOCS "failed to respond in a reasonable and adequate manner to ... each of the incidents [she] reported." *Richardson,* 1997 WL 797527, at *6. In this regard, the court found that DOCS "conducted investigations into the reported incidents, attached reminders to employee paychecks that harassment would not be tolerated, ... and immediately fired the two co-workers involved in the 'Farmer's Dayvorce' joke." *Id.* In the district court's view, "each of [DOCS's] responses was commensurate with the seriousness of the alleged incident." *Id.*

It is true that DOCS responded to some of Richardson's complaints. For example, Richardson received a written apology from Father Enright after his comments in the training session; she received a letter from Superintendent Coughlin in which he acknowledged her discomfort at how the "Buckwheat" comment was handled; and, perhaps most significantly, the two workers who distributed the "Farmer's Dayvorce" joke were terminated im-

mediately once that incident was reported (that those workers were ultimately reinstated as a result of administrative grievance proceedings does not diminish the speed and force of DOCS's response to their conduct).

Nonetheless, there were other incidents in response to which DOCS took no action, and harassment continued after Richardson made her complaints. We thus believe that reasonable jurors could disagree about whether DOCS's responses were so "effectively remedial and prompt" as to shield DOCS from liability as a matter of law. This is particularly so in light of Van Houter's investigation of ACF in late 1990. Van Houter likened the environment she experienced during her ACF investigation to a "lynching," and concluded that "[a]ll interviewees except complainant[ ] appears to lack cultural/racial sensitivity." Van Houter recommended that DOCS conduct a "Cultural Awareness Training" seminar at ACF and offered to conduct such a training program within sixty days if given the authority to do so. Despite this recommendation by Van Houter—DOCS's own Affirmative Action investigator—no such training occurred until approximately three years later, an interval in which some of the more severe incidents occurred. While the question may be a close one, we believe the district court erred when it reached the sweeping conclusion that "there was no evidence that the Defendant failed to respond in a reasonable and adequate manner to each of the incidents reported by the Plaintiff at ACF," and that "[t]he evidence shows that each of the Defendant's responses was commensurate with the seriousness of the alleged incident." *Richardson,* 1997 WL 797527, at *5. A factfinder may well conclude that DOCS's responses *were* reasonable and adequate. We cannot, however, say as a matter of law that the record evidence compels only that result. Accordingly, summary judgment should not have been granted on this ground.

The two remaining ACF incidents about which Richardson complains were committed by a supervisor (Cuff's statements that certain African–Americans who were suspects in a recent murder looked like "apes or baboons" and that "black people are so dark you can't see them anyway"). Under *Faragher,* DOCS would be held absolutely liable for Cuff's conduct if, as it appears from the record, Cuff is a "supervisor with immediate (or successively higher) authority over the employee." *Faragher,* 118 S.Ct. at 2292–93. If, as appears here, the employee-victim suffered no tangible employment action, DOCS would be able to prevail with an affirmative defense if it could establish both that (1) it "exercised reasonable care to prevent and correct promptly any ... harassing behavior," and (2) Richardson "unreasonably failed to take advantage of any preventive or corrective opportunities provided by [DOCS] or to avoid harm otherwise." *Id.* at 2293. *Faragher* and *Burlington* were decided after the district court's decision in this case. This Court, in deciding a case on direct review, must apply the law as it exists at the time of our review, *see Harper v. Virginia Dep't of Taxation,* 509 U.S. 86, 90, 113 S.Ct. 2510, 125 L.Ed.2d 74 (1993); *Whitney v. Empire Blue Cross & Blue Shield,* 106 F.3d 475, 477–78 (2d Cir.1997) (vacating and remanding for reconsideration in light of intervening change in law).

Cuff's two comments were part of the larger hostile work environment at ACF of which Richardson complains. It is clear that if DOCS is not entitled to summary judgment on the question of liability for harassment by her co-workers, it cannot be entitled to summary judgment on the question of liability for harassment by her supervisor. For if, as we found above, reasonable jurors could conclude that DOCS's response to Richardson's complaints were unreasonable and inadequate, DOCS cannot assert that as a matter of law it "exercised reasonable care" under *Faragher.* Nor is there any dispute that Richardson took advantage of all avenues

of complaint ACF made available to her. *See Faragher* at 2293. Accordingly, DOCS was not entitled to summary judgment on the question of employer liability for the hostile work environment at ACF. We reverse the court's order granting defendant's motion and remand with instructions to deny the motion.

## B. *Title VII—Retaliation*

Title VII provides that it "shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because [such employee] has opposed any practice made an unlawful practice by this subchapter." 42 U.S.C. § 2000e–3(a). Richardson contends that DOCS violated this provision by retaliating against her for complaining about and filing charges concerning the harassment she claims to have suffered at ACF.

 We evaluate retaliation claims under the burden shifting rules established by the Supreme Court in *McDonnell Douglas v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Quinn*, 159 F.3d at 764. In the context of a motion for summary judgment, the plaintiff must first demonstrate a *prima facie* case of retaliation, after which the defendant has the burden of pointing to evidence that there was a legitimate, nonretaliatory reason for the complained of action. If the defendant meets its burden, the plaintiff must demonstrate that there is sufficient potential proof for a reasonable jury to find the proffered legitimate reason merely a pretext for impermissible retaliation. *Gallagher*, 139 F.3d at 349.

 To establish a *prima facie* case of retaliation a plaintiff must show (1) participation in a protected activity that is known to the defendant, (2) an employment decision or action disadvantaging the plaintiff, and (3) a causal connection between the protected activity and the adverse decision. *See Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 713 (2d Cir.1996).

There is no disagreement that Richardson engaged in protected activity when she complained to supervisors about harassment, filed her EEOC charge and filed her lawsuit. *See Gallagher*, 139 F.3d at 349. Rather, the dispute centers on whether Richardson was subjected to any adverse and disadvantaging employment actions and, if so, what causal connection, if any, exists between those actions and her protected activities. Richardson claims she was retaliated against in four separate ways and we evaluate each in turn.

### 1. *Performance Reviews*

 Richardson alleges that she was first retaliated against in 1990 when, after complaining about racial harassment, she received two reviews that deemed her performance "average" rather than "excellent." We agree with the district court that Richardson failed to establish that the reviews in question constituted an adverse or disadvantaging employment decision as is required under the second prong of the retaliation *prima facie* case.

As an initial matter, as the district court concluded, the evaluations rated her as "average," not as below average. More importantly, however, Richardson provided no specific evidence as to what the evaluations actually said, or how or why she deserved better. The record does not contain copies of the evaluations or otherwise explain how they were unwarranted, and when asked at her deposition about these evaluations, Richardson responded that she could not "remember the exact evaluations or any of the specifics." The conclusory allegation that she deserved an excellent, rather than an average, performance rating is insufficient to establish that the evaluations constitute adverse or disadvantageous actions by DOCS. *See Smart v. Ball State Univ.*, 89 F.3d 437, 442–43 (7th Cir.1996) (finding that plaintiff's negative job evaluations alone did not constitute adverse employment action for purposes of retaliation *prima facie* case). We thus agree with the district court that Richard-

son failed to establish a *prima facie* case that DOCS retaliated against her by issuing the performance reviews it did.

## 2. *Transfer in Response to Filing EEOC Charge*

Richardson claims that DOCS further retaliated against her when, upon her return from her first leave of absence in August 1993, she was transferred to CCF and assigned a new job that brought her into contact with inmates. The district court concluded that the transfer and reassignment did not constitute an adverse employment decision because Richardson consented to the transfer and failed to apply for an alternative position that was available and for which she was qualified. *See Richardson,* 1997 WL 797527, at *6. In rejecting her claim, the district court wrote that "[o]n this record, there is no evidence of retaliatory animus or that Plaintiff was treated differently than other transferees." *Id.* This language suggests that the district court deemed Richardson failed to establish the requisite causal connection between her protected activity and the transfer and reassignment. *See DeCintio v. Westchester County Med. Ctr.,* 821 F.2d 111, 115 (2d Cir.1987) (proof of a causal connection can be established "directly through evidence of retaliatory animus directed against a plaintiff," or "indirectly by showing that the protected activity was followed closely by discriminatory treatment ... through other evidence such as disparate treatment of fellow employees who engaged in similar conduct").

■ We conclude that Richardson did establish a *prima facie* case of retaliation with regard to the transfer and reassign

ment. In particular, Richardson testified that she believed that DOCS transferred her to CCF in the hopes that she would quit; that "that whole situation and the stores clerk position was set up to force me out of there."

There was sufficient evidence to conclude that the transfer and reassignment—which involved different job responsibilities and a move to a position involving contact with the prisoner population—constituted an adverse employment decision. *See de la Cruz v. New York City Human Resources Admin. & Dep't of Social Servs.,* 82 F.3d 16, 21 (2d Cir.1996) (deeming transfer to comparable position with no change in pay but different job responsibilities to constitute adverse employment decision); *Hampton v. Borough of Tinton Falls Police Dep't,* 98 F.3d 107, 116 (3d Cir.1996) (reversing grant of summary judgment and leaving for jury questions whether defendant's "reassignment" of plaintiff was in fact a "transfer" or a "demotion" and whether the move was an "adverse employment decision"); *Collins v. Illinois,* 830 F.2d 692, 702–04 (7th Cir. 1987) (lateral transfer with change in responsibilities but same benefits and pay is adverse employment action).

■ Moreover, because the transfer and reassignment were the first actions DOCS took after Richardson returned from the leave on which she filed her EEOC charge, there was sufficient evidence that the transfer and reassignment were causally related to Richardson's engagement in protected activity. Accordingly Richardson satisfied her *de minimis* burden and established a *prima facie* case of retaliation.[4]

---

4. The Chief Judge in his dissenting opinion maintains that Richardson did not suffer an adverse employment decision, and hence did not make out a *prima facie* case, because she asked to be transferred and was offered and voluntarily accepted reassignment to the only position available at that time.

Richardson acknowledges that she sought a transfer, which is understandable given the

difficulties she encountered at ACF. Accordingly, she bases her claim not on the transfer itself, but on her reassignment to the less desirable position of "stores clerk," a job that involved inmate contact. Moreover, although one exchange in the deposition transcript indicates that Richardson "believed" that the stores clerk job was the only position available at the time of her transfer, her claim

Once a plaintiff makes out a *prima facie* case, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason why the action was taken. In this case, DOCS has failed, both below and on appeal, to proffer a legitimate reason for the transfer. Because DOCS has not met its burden of production, summary judgment may not be granted dismissing Richardson's retaliatory transfer claim.

### 3. Retaliatory Harassment at CCF

Richardson also contends that DOCS retaliated against her when it was aware of, but failed to respond to, a pattern of retaliatory acts waged against her by supervisors and co-workers at CCF. In particular, Richardson alleges that CCF personnel were aware of and harassed her because of the protected activities in which she engaged in her attempts to fight the harassment she perceived at ACF. According to Richardson, DOCS's failure to stop that harassment constitutes retaliation prohibited by Title VII.

Although Richardson raised this theory of liability in opposition to DOCS's motion for summary judgment, the district court did not address the argument in its opinion dismissing Richardson's retaliation claim, and DOCS has failed to address the theory in its briefing in this Court. As discussed below, we hold that Richardson established a *prima facie* case of retaliation based on these allegations, and that summary judgment was inappropriately granted in DOCS's favor on this claim.

Courts disagree about whether an employee suffers "adverse employment action" for the purposes of a retaliation claim when, as Richardson alleges, her employer allows her co-workers to harass her because she engaged in protected activity. *Compare Gunnell v. Utah Valley State College*, 152 F.3d 1253, 1264 (10th Cir.1998) ("[C]o-worker hostility or retaliatory harassment, if sufficiently severe, may constitute 'adverse employment action' for purposes of a retaliation claim."), *and Knox v. State of Indiana*, 93 F.3d 1327, 1334 (7th Cir.1996) ("No one would question the retaliatory effect of many actions that put the complainant in a more unfriendly working environment.... Nothing indicates why a different form of retaliation—namely, retaliating against a complainant by permitting her fellow employees to punish her for invoking her rights under Title VII—does not fall within the statute."), *with Manning v. Metropolitan Life Ins. Co.*, 127 F.3d 686, 692 (8th Cir.1997) (rejecting theory and instead requiring "tangible change in duties or working conditions that constituted a material employment disadvantage"), *and Munday v. Waste Management of North*

must also be viewed in light of her contemporaneous testimony, elicited by DOCS and found ten pages later in the transcript, that a position of keyboard specialist for which she was qualified was being advertised when she reported for work at CCF. We believe that this evidence, albeit thin, was sufficient, at least at the *prima facie* stage, to permit an inference that the reassignment to the less desirable position was an adverse employment action taken in response to Richardson's prior participation in protected activity. A plaintiff's burden at the *prima facie* stage is not onerous. *See Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 37 (2d Cir.1994) ("The burden of proof that must be met to permit an employment-discrimination plaintiff to survive a summary judgment motion at the prima facie stage is *de minimis*." (citation, internal quotation marks and alteration omitted)).

Although arguing that Richardson failed to make out a *prima facie* case, what the dissent actually reveals is that DOCS may have had legitimate, non-retaliatory reasons for reassigning Richardson in the manner it did, *e. g.*, she asked to be transferred and apparently was reassigned to the only position available at that time. Had DOCS proffered even one such reason in support of its motion it may well have prevailed and steered clear of the supposed "Catch–22" envisioned by the dissent. Once DOCS proffered such a reason, Richardson would have faced the often arduous task of proving that the proffered reason was merely a pretext for retaliation and that the reassignment was prompted by an impermissible motive. But in moving for summary judgment DOCS chose not to proffer a single non-retaliatory reason for the transfer, and it is not our role to do so now on DOCS's behalf.

*America,* 126 F.3d 239, 243 (4th Cir.1997) (holding that employer's instructions to ignore or spy on employee who engaged in protected activity do not constitute "adverse employment action" absent evidence that terms, conditions or benefits of employment were adversely affected), *cert. denied,* — U.S. ——, 118 S.Ct. 1053, 140 L.Ed.2d 116 (1998), *and Mattern v. Eastman Kodak Co.,* 104 F.3d 702, 707 (5th Cir.) (requiring employer action in the nature of an "ultimate employment decision" such as those concerning "hiring, granting leave, discharging, promoting, and compensating"), *cert. denied,* — U.S. ——, 118 S.Ct. 336, 139 L.Ed.2d 260 (1997).

■ We adopt the view that unchecked retaliatory co-worker harassment, if sufficiently severe, may constitute adverse employment action so as to satisfy the second prong of the retaliation *prima facie* case. This conclusion is consistent with our prior cases addressing what constitutes "adverse employment action."

■ We have recognized that Title VII does not "define adverse employment action solely in terms of job termination or reduced wages and benefits, and that less flagrant reprisals by employers may indeed be adverse." *Wanamaker v. Columbian Rope Co.,* 108 F.3d 462, 466 (2d Cir. 1997). At the same time, however, " 'not every unpleasant matter short of [discharge or demotion] creates a cause of action' for retaliatory discharge." *Id.* (quoting *Welsh v. Derwinski,* 14 F.3d 85, 86 (1st Cir.1994)) (alteration in original). Accordingly, a plaintiff may suffer an "adverse employment action" if she endures a "materially adverse change in the terms and conditions of employment." *See Torres v. Pisano,* 116 F.3d at 640 (quoting *McKenney v. New York City Off–Track Betting Corp.,* 903 F.Supp. 619, 623 (S.D.N.Y.1995) (citing *Crady v. Liberty Bank & Trust Co. of Indiana,* 993 F.2d 132, 136 (7th Cir.1993))). In applying this standard, we recall that "[b]ecause there are no bright-line rules, courts must pore over each case to determine whether the challenged employment action reaches the level of 'adverse.' " *Wanamaker,* 108 F.3d at 466.

■ An employee could suffer a materially adverse change in the terms and conditions of her employment if her employer knew about but failed to take action to abate retaliatory harassment inflicted by co-workers. Just as an employer will be liable in negligence for a racially or sexually hostile work environment created by a victim's co-workers if the employer knows about (or reasonably should know about) that harassment but fails to take appropriately remedial action, *see Burlington Industries,* 118 S.Ct. at 2267; *Kracunas v. Iona College,* 119 F.3d at 89, so too will an employer be held accountable for allowing retaliatory co-worker harassment to occur if it knows about that harassment but fails to act to stop it. *See Knox,* 93 F.3d at 1334 (holding that "there is nothing to indicate that the principle of employer responsibility [involved in direct claims of harassment by co-workers] does not extend equally to other Title VII claims, such as a claim of unlawful retaliation," and approving jury instruction that employers can be liable for co-worker actions when they know about and fail to correct the offensive conduct); *Gunnell,* 152 F.3d at 1265 (holding that employer will be liable for harassment inflicted by the victim's co-workers if (1) supervisory or management personnel knew about and acquiesced in or condoned the retaliatory harassment by the plaintiff's co-workers, or (2) supervisory or management personnel orchestrated the campaign of co-worker harassment).

■ Here, Richardson has alleged facts to support a Title VII retaliation claim based on unchecked retaliatory harassment inflicted by her co-workers. The evidence Richardson presented shows that she was the target of abusive treatment from her co-workers at CCF after filing her lawsuit. This included manure in her parking space, hair in her food, a

rubber band shot at her, and scratches on her car. Several of these incidents occurred shortly after deposition notices were served in Richardson's lawsuit in June 1995. The record further shows that DOCS officials did little to improve the situation, suggesting only that she try mediation and reminding her that it might be "hard to change attitudes."

While a jury may find that Richardson has not suffered a materially adverse change in the terms and conditions of her employment, or that the incidents in question were not connected to plaintiff's litigation, Richardson's allegations clearly state a *prima facie* claim of retaliatory harassment—one that DOCS, by its silence, has failed to rebut. Accordingly, DOCS's motion for summary judgment should not have been granted, and we reverse the district court's dismissal of this claim.

### 4. Constructive Discharge

■ Finally, Richardson charges that she was constructively discharged when, during her final leave of absence, DOCS deemed her to have resigned when she failed to answer DOCS's request for medical documentation justifying her continued absence. On this claim, the district court properly concluded that Richardson failed to establish the requisite causal connection between the purported discharge and her filing of the EEOC charge and the federal lawsuit. Proof of a causal connection can be established "directly through evidence of retaliatory animus directed against the plaintiff," *DeCintio*, 821 F.2d at 115 (citations omitted), or "indirectly by showing that the protected activity was followed closely by the discriminatory treatment, . . . or through other evidence such as disparate treatment of fellow employees who engaged in similar conduct," *id.*

■ Although Richardson filed the EEOC charge in December 1992 and her federal lawsuit in January 1994, she was not discharged until January 1996. This two year gap is too wide to support the inference that she was terminated in retaliation for complaining about discrimination, and Richardson failed to adduce any other evidence to indicate that her discharge was the product of retaliatory animus. Nor did Richardson provide evidence that DOCS treated other employees in a dissimilar fashion.

■ Moreover, even assuming that a causal connection did exist, DOCS has offered a legitimate, nondiscriminatory reason for terminating her employment, *i.e.*, Richardson's undisputed failure to respond to DOCS's legitimate demand that she provide written documentation supporting her absence. Because Richardson has not come forward with any evidence (other than her general claim of discrimination) that that reason was pretextual, the district court properly granted DOCS summary judgment on the constructive discharge retaliation claim. *See, e. g., Holt v. KMI–Continental*, 95 F.3d 123, 130 (2d Cir.1996) (affirming grant of summary judgment for defendant on retaliation claim where plaintiff failed to put forth any evidence, beyond her own personal belief, that the defendant's articulated nondiscriminatory reason for employment action was pretextual).

### C. Eleventh Amendment

■ Richardson's final argument on appeal challenges the district court's decision to dismiss her state law claims against DOCS on Eleventh Amendment grounds. Richardson does not contest the substance of that ruling, but instead argues that the district court should not have so ruled because the state had already waived that defense by failing to assert it in its answer.

■ As interpreted, the Eleventh Amendment[5] generally prohibits suits

5. The Eleventh Amendment provides:
 The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens

against state governments in federal court. *See Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 106, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984). The Eleventh Amendment "is concerned with judicial authority and limits the power of Article III courts over actions brought against States." *Close v. New York*, 125 F.3d 31, 39 (2d Cir.1997). In protecting the states from suit, the Eleventh Amendment presupposes "(1) that each state is a sovereign entity in our federal system; and (2) that it is inherent in the nature of sovereignty not to be amenable to the suit of an individual without its consent." *Id.* at 36 (citing *Seminole Tribe v. Florida*, 517 U.S. 44, 54, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996)). The Eleventh Amendment thus "affirm[s] that the fundamental principle of sovereign immunity limits the grant of judicial authority in Art. III." *Pennhurst*, 465 U.S. at 98, 104 S.Ct. 900; *see Close*, 125 F.3d at 39.

■ Eleventh Amendment immunity is not absolute, however. To the contrary, a state may be divested of immunity and haled into federal court in one of two ways: (1) Congress may abrogate the sovereign immunity through a statutory enactment, *Close*, 125 F.3d at 36 (citing *Fitzpatrick v. Bitzer*, 427 U.S. 445, 452–56, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976)), or (2) a state may waive its immunity and agree to be sued in federal court, *see id.* (citing *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 238, 105 S.Ct. 3142, 87 L.Ed.2d 171 (1985)). Richardson draws our attention to the second method, arguing that New York waived its Eleventh Amendment immunity when DOCS failed to raise the issue in its answer.

■ "The test for determining whether a State has waived its immunity from federal-court jurisdiction is a stringent one." *Atascadero*, 473 U.S. at 241, 105 S.Ct. 3142. Accordingly, waiver is found only where stated "by the most express language or by such overwhelming implications from the text as will leave no room for any other reasonable construction." *Edelman v. Jordan*, 415 U.S. 651, 673, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974) (citation and alteration omitted); *Close*, 125 F.3d at 39. As explained below, DOCS's failure to raise the defense in its answer does not constitute such an unambiguous waiver.

In *Ford Motor Co. v. Department of the Treasury*, 323 U.S. 459, 467–68, 65 S.Ct. 347, 89 L.Ed. 389 (1944), the Supreme Court held that the Eleventh Amendment "declares a policy and sets forth an explicit limitation on federal judicial power of such compelling force" that the issue could be raised for the first time in the Supreme Court. Some thirty years later, in *Edelman*, the Supreme Court held that the Eleventh Amendment defense "sufficiently partakes of the nature of a jurisdictional bar so that it need not be raised in the trial court." 415 U.S. at 677–78, 94 S.Ct. 1347. Indeed, following this reasoning we have viewed the amendment as affecting our subject matter jurisdiction and raised the issue *sua sponte* to dismiss claims against New York State. *Atlantic Healthcare Benefits Trust v. Googins*, 2 F.3d 1, 4 (2d Cir.1993). Despite the decidedly jurisdictional character of the Eleventh Amendment, Richardson argues that DOCS's failure to raise the issue in its answer constitutes a waiver.

Richardson is correct that some cases have characterized the Eleventh Amendment as presenting something less than a pure jurisdictional bar. As an initial matter, unlike a true jurisdictional bar, the defense may be waived. *See Atascadero*, 473 U.S. at 241, 105 S.Ct. 3142. Additionally, the Supreme Court has suggested that it is not obligated to raise the issue on its own motion. *See Patsy v. Board of Regents*, 457 U.S. 496, 516 n. 19, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1981) (reflecting that the Eleventh Amendment was not jurisdictional in the sense "that it must be

of another State, or by Citizens or Subjects of any Foreign State.

U.S. Const. amend. XI.

raised and decided by this Court on its own motion," and choosing not to rule on immunity grounds, but leaving the state free to raise the defense on remand); *but see id.* at 519–20, 529, 102 S.Ct. 2557 (Powell, *J.,* dissenting) (arguing that Eleventh Amendment is purely jurisdictional and that in failing to so hold the *Patsy* Court "disregard[ed] controlling decisions and the explicit limitation on federal-court jurisdiction in Art. III and the Eleventh Amendment"). And some courts have likened Eleventh Amendment immunity to an affirmative defense, at least to the extent that its proponent should bear the burden of establishing that it applies. *See ITSI T.V. Productions v. Agricultural Assocs.,* 3 F.3d 1289, 1291 (9th Cir.1993) (reasoning that "whatever its jurisdictional attributes, [Eleventh Amendment immunity] should be treated as an affirmative defense" and concluding that "that which is promised by the Eleventh Amendment must be proved by the party that asserts it and would benefit from its acceptance"); *see also Christy v. Pennsylvania Turnpike Comm'n,* 54 F.3d 1140, 1144 (3d Cir.1995) (following *ITSI T.V.*).

Although these decisions may suggest ways in which the Eleventh Amendment differs from other jurisdictional bars, they simply do not establish the proposition that Richardson seeks to advance: that a failure to raise the Eleventh Amendment in an answer constitutes a waiver of the immunity that amendment provides. At most, *Patsy* raises the question of whether federal courts "are required or merely authorized to consider *sua sponte* the Eleventh Amendment's applicability." *See*

*Mascheroni v. Board of Regents,* 28 F.3d 1554, 1558–59 (10th Cir.1994). Indeed, the *Patsy* Court explicitly permitted the state to raise the defense on remand, even though the state had failed to raise the issue in the Supreme Court. For their part, *ITSI* and decisions following it deal only with burdens of proof and do not support the proposition that a defendant's failure to assert the defense in its answer constitutes a waiver of immunity.[6]

However the Eleventh Amendment immunity may differ from other jurisdictional bars, the law remains clear that it is jurisdictional enough that it need not be raised in the trial court. *See Edelman,* 415 U.S. at 677–78, 94 S.Ct. 1347. Here, DOCS did raise the defense in the trial court, albeit in its motion for summary judgment rather than in its answer. To hold that that was "too late"—that that constituted a waiver—would run contrary to *Edelman* and *Ford Motor Co.,* and *Patsy* does not hold to the contrary. *See Patsy,* 457 U.S. at 515 n. 19, 102 S.Ct. 2557 (clarifying that State Board of Regents was free to raise its Eleventh Amendment defense on remand).

DOCS did not waive its Eleventh Amendment immunity by failing to raise the defense until it moved for summary judgment, and we affirm the district court's decision to dismiss the state law claims against DOCS on Eleventh Amendment grounds.

### CONCLUSION

On Richardson's Title VII hostile environment claim, we affirm the decision of

---

**6.** Richardson relies also on language in *Blatchford v. Native Village of Noatak & Circle Village,* 501 U.S. 775, 784 n. 3, 111 S.Ct. 2578, 115 L.Ed.2d 686 (1991), where the Court in dicta rejected the contention that a rule announced in a prior decision, *Moe v. Confederated Salish and Kootenai Tribes,* 425 U.S. 463, 96 S.Ct. 1634, 48 L.Ed.2d 96 (1976), implicated the Eleventh Amendment. The *Blatchford* Court stated that because the state defendant in *Moe* "had not objected in this Court on sovereign immunity grounds, its immunity had been waived and was not at

issue." *Blatchford,* 501 U.S. at 784 n. 3, 111 S.Ct. 2578. Even if this language had precedential value—and it does not—the most that can be said is that *Blatchford* should be read as interpreting *Moe* in light of the principle announced in *Patsy:* the Supreme Court is not obliged to raise Eleventh Amendment immunity absent a defendant's objection on that ground. Because the *Moe* defendants failed to object on Eleventh Amendment grounds, the Court was free to reach the merits of the case. Neither *Moe* nor *Blatchford* suggests anything more.

the district court to the extent it dismissed the claim based on the CCF environment, but we reverse to the extent it dismissed the claim based on the ACF environment. On Richardson's Title VII retaliation claim, we affirm the decision of the district court to the extent it dismissed the claims based on performance reviews and constructive discharge, but reverse the grant of summary judgment on the claims premised upon Richardson's transfer to CCF and upon the retaliatory harassment she claims to have suffered once there. We affirm the district court's dismissal of Richardson's state law claims on Eleventh Amendment grounds. The judgment is vacated and the case is remanded to the district court for further proceedings consistent with this opinion.

WINTER, Chief Judge, concurring in part and dissenting in part:

I concur in the majority opinion except for the reversal of the grant of summary judgment on Richardson's retaliation claim so far as it was based upon her transfer. As to that, I respectfully dissent.

My colleagues posit a record supporting a factual finding that, after Richardson filed a discrimination complaint, NYDOCS involuntarily transferred her to a less desirable job, a transfer from which a retaliatory motive might be inferred. Actually, however, it is undisputed that, after filing the complaint, Richardson asked for a transfer, and NYDOCS offered her the only position then available, with an option to take it or not. She chose to take it. In my view, there can be no permissible inference of retaliatory motive from these facts.

NYDOCS Statement Pursuant to Local Rule 7.1(f) ¶¶ 38–41 (proffering undisputed facts surrounding transfer) and Richardson's Submissions in Opposition, at 4 (admitting facts provided by NYDOCS about the transfer) establish as undisputed that: (i) the transfer occurred at Richardson's request, (ii) the position was the only job available at that time, (iii) she had the option of accepting the Cayuga position or remaining at Auburn, and (iv) she voluntarily chose Auburn.

That these facts are undisputed is underlined by Richardson's own deposition testimony:

Q: And at that time [during her leave] is it fair to say that your attorney, Mimi Satter, contacted the Department of Correctional Services to see if a position could be found at another correctional facility, you know, a place other than Auburn?

A: Yes.

. . . . .

Q The question was, did there come a time that you were advised that there was a position available for you at Cayuga Correctional Facility?

A Yes.

Q And what were you told?

A I was told that I didn't have to go back to Auburn, that there was a position available at Cayuga Correctional.

Q Did you accept that position at Cayuga?

A Yes, I did.

Q Did you accept that position voluntarily?

A Yes, I did.

My colleagues conclude that Richardson's transfer might be found by a trier of fact to constitute an adverse employment action, relying on her allegation that the Cayuga job was less desirable than the one at Auburn. While there is caselaw that quite properly holds that an involuntary transfer to a different job can be found by a trier of fact to have been an adverse employment decision, see, e.g., de la Cruz v. New York City Human Resources Admin. & Dep't of Soc. Servs., 82 F.3d 16, 21 (2d Cir.1996), it hardly applies in circumstances where, in response to a request by the employee, the employer offers the only job available, leaving the decision whether or not to transfer to the employee.

This decision creates a Catch–22 for employers. Once an employee files a discrimination claim and requests a transfer, the offering of a transfer to the only open position seems less adverse to the employee than either denying the request or ordering a mandatory transfer. If offering a transfer to the only job available can support a finding of retaliation, then surely denying or ordering one can also support such a finding. An employee who files a discrimination claim and request for transfer, therefore, will have automatically established a prima facie case under my colleagues' theory. Because that cannot be the law, I respectfully dissent on that one issue.