Vicky MORF, Plaintiff,

v.

TURNER BELLOWS, INC., Defendant.

No. 98–CV–6242.

United States District Court,
W.D. New York.

Jan. 17, 2001.

Nira T. Kermisch, Rochester, NY, for plaintiff.

Henry R. Ippolito, Chamberlain, D'Amanda, Oppenheimer & Greenfield, Rochester, NY, for defendant.

## ORDER

LARIMER, Chief Judge.

Plaintiff, Vicky Morf, filed the complaint in this action on June 3, 1998, against her former employer, Turner Bellows, Inc. ("Turner"). Plaintiff alleges that she was subjected to sexual harassment by her coworkers at Turner, and that her supervisors did nothing in response to her complaints. She alleges that she quit her job with Turner in February 1998, because she could no longer tolerate the hostile work environment there. Plaintiff asserts one claim under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and a claim under the New York Human Rights Law, Exec. L. § 296. Defendant has moved for summary judgment.

## FACTUAL BACKGROUND

It is undisputed that plaintiff began her employment with Turner on June 3, 1996, doing assembly work. The complaint alleges that about two months after she began working at Turner, plaintiff started dating a coworker. In her deposition testimony, however, plaintiff stated that she did not date the coworker, Romando Logan, but only "hung out with" him. Morf Depo. at 33–34. At any rate, the complaint alleges that at about the time she began spending time with Logan, other coworkers began harassing her by making explicit sexually-oriented comments to her on a daily basis. Plaintiff also alleges that sexually explicit notes were left on her car while she was at work.

· Plaintiff testified that the first incident at Turner that she considered to constitute sexual harassment occurred around August 1996, when she walked past three "boys" and "felt someone grab [her] butt." Morf Depo. at 27–28. When she turned around, the boys were "laughing at pointing at each other, blaming it on each other," so she did not know which one of them had grabbed her. Morf Depo. at 28. Plaintiff stated that she "gave them a dirty look" and walked away. Morf Depo. at 29. She did not report the incident to any of her supervisors. She did tell some female coworkers about it, and they told her that that was "how the men there were." Morf Depo. at 29–30.

The next incident, or rather series of incidents, about which plaintiff testified at her deposition, involved verbal harassment. Plaintiff stated, "[t]he next incident was people calling me all kinds of whores, saying I fuck myself, I do this, I fuck my posters at home, just gets really vulgar." Morf Depo. at 30. She stated that this happened "[e]very single time [she] walked by the floor to go to break or lunch or before [she and her coworkers] got out of work standing in line." Morf Depo. at 31. When asked if she knew why this was occurring, plaintiff stated, "I believe because my cousin Kenny [General, who also worked at Turner] was starting rumors saying I was all kinds of whores." Morf Depo. at 32. She opined that Kenny did so "[b]ecause he's weird." Morf Depo. at 33. Plaintiff also stated that her coworkers would shout things at her and call her names through the bathroom door when plaintiff was in the bathroom. Morf Depo. at 37–38.

Plaintiff testified that she reported this harassment to Jimmy Hernandez, who "was the one that was watching us and getting our parts...." Morf Depo. at 36. Although plaintiff said that she believed that either "Jimmy or Tom [Rowley, plaintiff's Production Supervisor]" had been her supervisor, she did not know Hernandez's title, she remembered having been told that Rowley was her supervisor, and she did not know if anyone had ever told her that Hernandez was her supervisor. Morf Depo. at 40. Apparently her reason for going to Hernandez was that plaintiff re-

called a prior floor meeting when either Rowley or Joseph Merry, the General Manager, said that the employees in plaintiff's work area should "go to Jimmy always first." Morf Depo. at 35.

At any rate, plaintiff testified that she complained about these incidents to Hernandez "[a] number of times, six or seven times." Morf Depo. at 37. She stated that Hernandez told her that "he would tell Tom and that Tom would talk to" plaintiff. Morf Depo. at 39. She did not know if he ever made good on his promise to relay her complaints to Rowley. Morf Depo. at 39.

Plaintiff also stated that she attempted to speak to Rowley about the harassment "[j]ust about every day." Morf Depo. at 40. She stated that for the most part, Rowley "always said he'd get to [plaintiff] later and he never did." Morf Depo. at 41. On one occasion during the Winter of 1997–98, however, she stated that she approached Rowley outside his office and told him about the harassment, and Rowley "made it so that [plaintiff] wouldn't have to work on the floor any more with the men." Morf Depo. at 41.[1] She stated that even after she moved back from the floor, however, the harassment continued, as male employees would say vulgar things to her, either by coming to plaintiff's table, shouting through the bathroom door, or saying things to her during lunch or other breaks.

Plaintiff also testified that around late 1997 or early 1998, two notes were left on her car door, within about a week of each other. She describes the notes as "explaining what somebody wanted to do to [her] sexually and saying [plaintiff] would find out who that person was at a later time." Morf Depo. at 53. She stated that a female coworker told her that the notes had been left by a male who went by the name of "Fud." Plaintiff did not remember if she told any of her supervisors about the notes. She did tell some female coworkers, who said that "Joe [Merry] wouldn't do shit" about it. Morf Depo. at 56.

Plaintiff further testified that around early 1998, up to the day when she left her employment, some male employees (mostly "Mando"[2] and "Angel") would touch her at lunchtime or while passing by her in the building. They would grab, or try to grab, her rear and her chest, and would kiss her.

The incident that led most directly to plaintiff's quitting occurred on February 23, 1998. Plaintiff testified that on that date, as she and a coworker, Maria Vazquez, were walking back from the break room, they passed by some male employees. Two of the men, Angel Martinez and Kenny General, started singing a song. The lyrics, which the men had apparently made up, contained vulgar references to lesbians and sex acts, and was directed at plaintiff and Vazquez. Plaintiff turned around and said to them, "That's enough," and "I'm telling." Morf Depo. at 74. The men responded, " 'Fuck you. Fuck you bitch. Fuck you,' over and over." Morf Depo. at 74.

Plaintiff testified that she went directly to Hernandez, who told her that "he would tell Tom because he had yelled at Mando a bunch of times to get out of the room and stop bugging" plaintiff. Morf Depo. at 75.

---

1. Although plaintiff's regular job required her to work only with other women, she testified that at some point she spent several weeks in a different area to fill in for someone who was on sick leave, and in that area plaintiff was among male employees.

2. "Mando" apparently refers to Romando Logan, the coworker with whom plaintiff had previously "hung out," but who later became angry at plaintiff because she refused to be his girlfriend. Morf Depo. at 51–52.

It is not clear whether Hernandez did tell Rowley, but later that same day plaintiff went to Rowley and told him what had happened. Rowley stated that he would talk to Merry about it. Morf Depo. at 77.

A few hours later, Rowley asked plaintiff to meet with him and Merry in Merry's office. Plaintiff told them what had happened, and that her cousin Kenny had been going around telling other employees that he had had sex with plaintiff. Plaintiff testified that Rowley and Merry laughed at her, and got "beet red in the face like it was a joke." Morf Depo. at 79. Eventually Merry said, "Oh, I'm sorry. Excuse me," but "he just couldn't stop laughing." Morf Depo. at 80. Plaintiff stated that she said to them, "Don't laugh too hard," and walked out. Morf Depo. at 81.

Later that day, plaintiff saw Angel and Kenny separately go to Merry's office, each for a few minutes, and leave. Plaintiff then went back to Merry's office, and Merry told her "how he gave Kenny the warning, he wrote up Angel and if anything else was to happen, report it to him." Morf Depo. at 83. He also said that Angel and Kenny had "told him that [plaintiff] was flipping them off and using vulgar language." Morf Depo. at 83. Merry and Rowley told plaintiff not to confront Angel or Kenny if any further incidents occurred, but to report it directly to them. Plaintiff testified that she received an oral warning of some kind, but she did not state what the substance of the alleged warning was.

Plaintiff testified that following this meeting, Angel and Kenny continued to harass and threaten her, and that Kenny tried to run her over in the parking lot. Plaintiff reported to work on February 24, 1998. Kenny, Angel, and Mando kept trying to bump into her, and shouted at her

while she was in the bathroom. Plaintiff testified that she told Rowley about Kenny's behavior. Rowley allegedly told her that he would take care of it. Morf Depo. at 85–86.

The next day, February 25, nothing had changed; the harassment continued as before. Plaintiff left at lunchtime, and never returned to Tuner, other than to pick up her final paycheck.

Defendant has submitted excerpts of the transcript from a hearing relating to plaintiff's claim for unemployment compensation benefits that took place in July 1998. Merry testified that when Rowley informed him of plaintiff's complaint about the song incident on February 23, he first spoke to plaintiff, and then to Angel Martinez. Martinez admitted singing the song, but claimed that it was not directed at plaintiff, and that plaintiff must simply have overheard him as she was walking by. Merry testified that he reviewed Martinez's file and saw no previous charges of harassment, so he decided that the appropriate action would be to issue a written warning.

Merry testified that when he told Martinez that Merry was going to write him up for harassment, Martinez stated that in that case, he wanted to file charges against plaintiff, because when she heard him singing, she "flipped him off and said F– you to him . . . ." Defendant's Motion ("DM") Ex. C at 69. Merry testified that he told Martinez, "okay, you know, I'll take that in mind . . . ." DM Ex. C at 69.

Merry testified that he then had Kenny General brought in. General denied singing any song. He also denied telling anyone that he and plaintiff had slept together. Merry gave General an oral warning.[3]

---

**3.** Why Merry decided against giving General a written warning, as he had Martinez, is not apparent from the limited excerpts of the transcript submitted by defendant.

Merry testified that he then spoke again with plaintiff, telling her what actions he had taken, and that if any further incidents occurred, she should report them immediately to Rowley or Merry, whereupon further action would be taken. He stated that he "then gave her a verbal warning for her not acting appropriate herself . . . ." DM Ex. C at 71. The warning was noted in her personnel file. DM Ex. C at 72. Merry stated that February 23 was the first time that he had received any complaints of this nature from plaintiff.

Jimmy Hernandez also testified at the hearing. He stated that the first time that plaintiff had complained to him about sexual harassment was sometime around February 20, 1998. He stated that plaintiff told him that two male employees "were singing a song, a derogatory song about lesbians and . . . she took it personally." DM Ex. C at 82. Hernandez testified that he told plaintiff to report the incident to her immediate supervisor, Tom Rowley, who was also Hernandez's immediate supervisor. Hernandez stated that he later checked with Rowley to see if plaintiff had contacted him about the incident, and was told that she had. He stated that he personally had never observed anyone harassing plaintiff at work. He did state, however, that on occasion he had told male employees to leave the area where plaintiff and her female coworkers were, because "the guys would stop to talk," and "they're not supposed to be in that department." DM Ex. C at 87. He stated, though, that this was a problem for "all the girls," not just plaintiff, and that plaintiff had never complained to him about men coming to harass her at her work station. DM Ex. C at 87. Hernandez also testified that it was not a part of

his job duties to take employee complaints about harassment, and that that responsibility lay with Rowley. DM Ex. C at 85.

Rowley was also a witness at the unemployment compensation hearing. He stated that the only time that plaintiff ever complained to him about sexual harassment was on February 23, 1998. Rowley testified that when plaintiff made her complaint to him, he went to Merry and informed him about the matter. His testimony about the meetings with Martinez, General and plaintiff for the most part corroborates Merry's testimony. Rowley added that plaintiff was given a warning "because after the incident took place she turned and gave a lewd gesture instead of just letting it go and reporting it to" Rowley. DM Ex. C at 7.[4] He testified that plaintiff admitted having made the gesture. DM Ex. C at 8.

## DISCUSSION

▮ In order to prevail on a claim that sexual harassment has caused a hostile work environment in violation of Title VII, a plaintiff must establish two elements. First, the plaintiff must show that her workplace was permeated with "discriminatory intimidation, ridicule, and insult . . . that [wa]s sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (internal quotation marks omitted). The plaintiff must demonstrate "either that a single incident was extraordinarily severe, or that a series of incidents were sufficiently continuous and concerted to have altered the conditions of her working environment." *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 570 (2d

---

4. Exhibit C to defendant's motion contains excerpts of transcripts from July 13, 1998, and from July 16, 1998, each of which is separately paginated. Rowley testified on July 16.

Cir.2000) (internal quotation marks omitted).

Second, the plaintiff must show that "a specific basis exists for imputing the conduct that created the hostile environment to the employer." *Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 149 (2d Cir. 1997); *see also Murray v. New York Univ. Coll. of Dentistry*, 57 F.3d 243, 249 (2d Cir.1995). When the source of the alleged harassment is a coworker, the plaintiff must demonstrate that the employer either: failed to provide a reasonable avenue for complaint; or, if it knew-or in the exercise of reasonable care should have known-about the harassment, failed to take appropriate remedial action. *Richardson v. New York State Dep't of Correctional Serv.*, 180 F.3d 426, 441 (2d Cir. 1999); *Kracunas v. Iona College*, 119 F.3d 80, 89 (2d Cir.1997).

In *Harris*, the Supreme Court set forth a non-exclusive list of factors relevant to determining whether a given workplace is permeated with discrimination so "severe or pervasive" as to support a Title VII claim. These include: (1) the frequency of the discriminatory conduct; (2) its severity; (3) whether the conduct was physically threatening or humiliating, or a "mere offensive utterance"; (4) whether the conduct unreasonably interfered with plaintiff's work; and (5) what psychological harm, if any, resulted to the plaintiff. 510 U.S. at 23, 114 S.Ct. 367.

The Second Circuit has instructed that the court should consider the totality of the circumstances in determining whether a plaintiff has submitted evidence sufficient to support a finding that a hostile work environment existed. *See Schwapp v. Town of Avon*, 118 F.3d 106, 111 (2d Cir.1997) (citing *Harris*, 510 U.S. at 23, 114 S.Ct. 367), and to evaluate the "quantity, frequency, and severity" of the incidents, *see id.* (citing *Vore v. Indiana Bell Tel. Co.*, 32 F.3d 1161, 1164 (7th Cir.1994)). The factors must be considered "cumulatively," so that the court can "obtain a realistic view of the work environment." *Id.* (quoting *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 444 (7th Cir.1994)).

Applying these standards to the case at bar, I find that defendant's motion for summary judgment must be denied. The evidence presented at this stage raises genuine issues of material fact both as to whether plaintiff was subjected to a hostile working environment, and as to whether a basis exists for imputing the conduct that created that environment to defendant.

First, I find that plaintiff has adduced sufficient evidence to give rise to a genuine issue of fact as to the first prong of the analysis, *i.e.*, whether her workplace was permeated with discriminatory intimidation so severe or pervasive as to alter the conditions of plaintiff's employment. In asserting that plaintiff has not made a sufficient showing, defendant focuses on the "song" incident on February 23, 1998, and contends that plaintiff's allegations of continual harassment prior to that date are conclusory and not supported by objective facts in the record. Although the February 23 incident may have been the most immediate cause of plaintiff's departure from Turner, the record shows that plaintiff has also alleged numerous prior incidents of sexual harassment. She testified that as early as August 1996, one or more male employees grabbed her in the rear, and that she was subjected to further unwanted physical contact in early 1998.

Plaintiff also testified to frequent verbal abuse, much of which was vulgar, explicit and offensive. She testified that she was subjected to these comments and insults "[e]very single time [she] walked by the floor to go to break or lunch or before [she and her coworkers] got out of work stand-

ing in line." She also testified that male employees would come to her work table and say vulgar things to her, and that they would shout things at her while she was in the bathroom. In addition, she stated that on two occasions, sexually-oriented notes were left on her car while she was at work. Keeping in mind that the court must examine the totality of the circumstances in making this assessment, as well as the fact that I must view the record in the light most favorable to plaintiff, the nonmoving party, *McKelvie v. Cooper*, 190 F.3d 58, 61 (2d Cir.1999), I believe that a rational factfinder could reasonably find that this alleged harassment did occur, and that it did alter plaintiff's working conditions. As in *Richardson*, "[r]easonable jurors may well disagree about whether these incidents would negatively alter the working conditions of a reasonable employee. But the potential for such disagreement renders summary judgment inappropriate." 180 F.3d at 439.

I also find that there are issues of fact as to the second prong, *i.e.,* whether defendant either failed to provide a reasonable avenue for complaint, or that it knew or should have known about the harassment, but failed to take appropriate remedial action.

First, although defendant insists that February 23, 1998 was the only time that plaintiff complained about sexual harassment to any of her supervisors, plaintiff herself testified otherwise. As stated, she said that she had complained "six or seven times" to Hernandez. While defendant contends that Hernandez was not plaintiff's supervisor, plaintiff testified that she had been instructed at a floor meeting "to go to Jimmy always first." This evidence presents a fact issue as to what instructions plaintiff had been given with respect to reporting incidents of harassment or complaints in general. Even if Rowley

was "officially" denominated as plaintiff's supervisor, defendants may not be able to avoid liability on that ground if in fact they led plaintiff to believe that Hernandez was the person to whom she should bring any complaints. At any rate, plaintiff testified that when she did complain to Hernandez, he told her that he would pass along her complaints to Rowley, which presents an additional issue of fact concerning whether Rowley learned of plaintiff's complaints prior to February 23.

In addition, plaintiff testified that she had tried to complain to Rowley about the harassment "[j]ust about every day," and that he essentially always put her off, saying that he would get back to her, but never doing so. I cannot simply disregard that testimony, which, if credited by the finder of fact, might support a finding that Rowley did know about plaintiff's complaints before February 23.

Likewise, I find that there are issues of fact about the sufficiency of defendant's response to plaintiff's complaints on February 23. For one thing, according to plaintiff, Merry's and Rowley's initial reaction was to laugh at what she told them, which, if believed, might cast some doubt on defendant's contention that they took plaintiff's complaints seriously. In addition, I cannot find that the action that defendant ultimately took—issuing a written warning to Martinez and an oral warning to General—was adequate as a matter of law. A jury might well decide that defendant's response was appropriate, but it is not my function at this point to weigh the competing evidence on that point. *See Gallagher v. Delaney*, 139 F.3d 338, 348 (2d Cir.1998) ("If the evidence creates an issue of fact as to whether an employer's action is effectively remedial and prompt, summary judgment is inappropriate").

I also note that plaintiff alleged that the harassment continued both after Rowley

moved her off the floor and back to her original work area, and after the meetings with Merry and Rowley on February 23. The Second Circuit has held that "if harassment continues after complaints are made, reasonable jurors may disagree about whether an employer's response was adequate." *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 72 (2d Cir. 2000); *see Richardson*, 180 F.3d at 442; *see also Carter v. Chrysler Corp.*, 173 F.3d 693, 702 (8th Cir.1999) ("Factors in assessing the reasonableness of remedial measures may include ... whether or not the measures ended the harassment") (internal citations omitted). I am cognizant of the fact that plaintiff quit just two days after Merry issued the warnings to Martinez and General. A jury might take that into consideration in determining whether defendant's response was adequate, and whether defendant afforded plaintiff a reasonable avenue for complaint, but plaintiff failed to take full advantage of it by simply walking out instead of going back to Merry and Rowley. Again, though, that is an issue of fact, not of law, and it cannot be resolved on a motion for summary judgment.

## CONCLUSION

Defendant's motion for summary judgment (Docket Item 9) is denied.

IT IS SO ORDERED.