**UTICA ALLOYS, INC. Plaintiff,**

v.

**ALCOA INC., Defendant.**

**No. 5:02–CV–972.**

United States District Court,
N.D. New York.

Jan. 28, 2004.

Cohen & Cohen LLP, Utica, NY (Daniel S. Cohen, of counsel), for plaintiff.

Leboeuf, Lamb, Green & Macrae, Pittsburgh, PA (Brian P. Cuthbertson, John C. Cleary, of counsel), Mackenzie Hughes LLP, Syracuse, NY (Peter D. Carmen, of Counsel), for defendant.

### *MEMORANDUM–DECISION and ORDER*

HURD, District Judge.

## I. INTRODUCTION

Plaintiff Utica Alloys, Inc. ("Utica Alloys, Inc." or "plaintiff") filed suit against defendant Alcoa Inc. ("Alcoa Inc." or "defendant") in New York State Supreme Court, alleging claims of *quantum meruit* and unjust enrichment. After the case was removed to federal court, defendant filed an answer together with a counterclaim for breach of contract.

Defendant filed a motion for summary judgment pursuant to Fed.R.Civ.P. 56 on its counterclaim as well as plaintiff's two claims. Plaintiff opposed, and filed a cross-motion for summary judgment on defendant's counterclaim. Oral argument was heard January 9, 2004, in Utica, New York. Decision was reserved.

## II. FACTUAL BACKGROUND

Alcoa Inc., through its business, generates a certain type of scrap metal. Part of plaintiff's business is buying and processing this type of scrap and selling it to its only user, General Electric, which utilizes it in land-based power turbines. On September 8, 2000, a purchase agreement was signed whereby Utica Alloys, Inc. agreed for nearly a one-year period to buy all of this type of scrap generated by Alcoa Inc. The purchase price was set, but the agreement contemplated it, along with processing and service, would be reviewed semiannually by the parties.

After the expiration of the initial agreement, a new purchase agreement was signed in late July of 2001, and was to run until August of 2003. The formula used for determining the monthly purchase price of the scrap, devised by Anthony Marino ("Marino"), a vice president at Utica Alloys, Inc., was indexed to the price of nickel, as reported on the London Metal Exchange. The review clause again appeared in the agreement, as follows: "The pricing, servicing and processing will be reviewed approximately every six (6) months beginning in January 2002." (Docket No. 24, Ex. D.)

In November of 2001, General Electric reduced its production of land-based power turbines, thereby deteriorating the market value of the type of scrap, after processing, at issue in the purchase agreement. Because, however, the purchase price formula in the purchase agreement was based on the value of nickel rather than the intrinsic or market value of the scrap, this market change was not reflected. Plaintiff claims it was therefore forced to absorb the losses caused by the change until January of 2002, when the first opportunity arose to invoke the review clause.

On February 13, 2002, Marino met with George O'Leary ("O'Leary"), his primary contact at Alcoa Inc., in response to the former's request for a purchase price review. At the meeting, Marino informed O'Leary that Utica Alloys, Inc. could not pay the purchase price as it was calculated in the agreement, and presented O'Leary with several restructuring options. Plaintiff claims that O'Leary informed Marino that he would try to work something out with defendant's suppliers and that Utica Alloys, Inc. should continue to process the scrap it received. Defendant denies O'Leary told Marino that plaintiff should continue processing the scrap. There is no question that Alcoa Inc. continued to ship the scrap, and Utica Alloys, Inc. continued to process it.

The parties engaged in months of failed negotiations on the purchase price of the scrap. Early in the negotiations, after scrap had begun to build up at it's facility, plaintiff proposed to buy the scrap shipped to it in February and March for $0.91 per pound. O'Leary allegedly responded with a question regarding plaintiff's processing charges. Defendant maintains, however, that throughout the negotiation process, O'Leary told Marino of its position that the terms of the agreement were to apply while the purchase price was under review.

Also during the negotiation process, in April of 2002, O'Leary made Utica Alloys, Inc. the following offer: that Utica Alloys, Inc. pay Alcoa Inc., at the agreement purchase price, for the scrap shipped in February of 2002; that defendant would not charge plaintiff for any scrap shipped after

February of 2002; and that defendant would pay the reasonable costs of processing the scrap. On April 23, 2002, Marino rejected the offer, stating plaintiff's inability to pay the purchase agreement price for the scrap shipped in February of 2002, as the company had already sustained significant losses. A few days prior, however, Marino offered to allow defendant to retain ownership of the scrap already shipped in exchange for the payment of the processing charges incurred by plaintiff to that point.[1] On April 30, 2002, plaintiff offered to buy all the scrap that had been shipped since February of 2002 for $1.03 per pound, with the processing charges for such scrap waived.

On May 6, 2002, Alcoa Inc. solicited bidders to purchase the scrap it had shipped to Utica Alloys, Inc. from February through April of 2002. O'Leary asked Marino if he could match the high bid.

On May 7, 2002, Marino sent O'Leary a proposed invoice for payment of the charges incurred by plaintiff in processing the scrap defendant had shipped. The proposed price for the processing, including inbound freight charges, was $84,293.35. Defendant did not respond to this proposed invoice.

On May 11, 2002, Marino advised O'Leary that it would match the high bid purchase price, but that Utica Alloys, Inc. expected to be paid $0.15 per pound for the scrap it had processed. O'Leary rejected payment of the processing charges and demanded a return of all the scrap Alcoa Inc. had shipped to Utica Alloys, Inc. since February of 2002. Marino responded that if the processing charges were not paid, the scrap would not be returned.

On May 15, 2002, Alcoa Inc. claims O'Leary re-extended both of its prior offers—the April of 2002 three-part offer, and the offer for plaintiff to match the high bid price with no offset for processing charges. The offers were left open for one week, and O'Leary allegedly advised Marino of defendant's belief that plaintiff had breached the agreement and that refusal to accept one of the offers would result in a collection action under the terms of the purchase agreement. Marino reiterated that plaintiff expected to be paid for the processing charges, and indicated a desire to continue the companies' relationship in the event the market became favorable again. O'Leary acknowledged his past overture that Alcoa Inc. would pay the processing charge as a part of the April of 2002 offer, but plaintiff claims he nevertheless responded that the contract was over and no more scrap would be shipped. Utica Alloys, Inc. thereafter permitted Alcoa Inc. to retrieve the processed scrap.

On May 20, 2002, defendant sent two purchase agreements to another buyer. In the first, it offered to sell the scrap that Utica Alloys, Inc. had processed for $1.17 per pound. In the second, it offered to sell unprocessed scrap for $1.19 per pound. This lawsuit followed.

## III. DISCUSSION

As noted above, Alcoa Inc. has moved for summary judgment on both its counterclaim and plaintiff's claims pursuant to Fed.R.Civ.P. 56. Utica Alloys, Inc. has

---

1. Indeed, despite the good faith efforts made by both parties during the negotiation process, it appears the one issue that could not be agreed upon was the purchase price for the scrap shipped in February of 2002. As a result, because this was a vital component to both defendant's offer (in the sense that it required payment for such scrap in accordance with the purchase agreement price) and plaintiff's offer (in the sense that it mandated that paying for the scrap in accordance with the purchase price agreement was not possible), no offer was ever accepted and the negotiations failed.

opposed defendant's motion as to its claims, contending that factual issues preclude summary judgment, and cross-moved for summary judgment on the counterclaim.

### A. Summary Judgment Standard

Summary judgment must be granted when the pleadings, depositions, answers to interrogatories, admissions and affidavits show that there is no genuine issue as to any material fact, and that the moving party is entitled to summary judgment as a matter of law. Fed.R.Civ.P. 56; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Richardson v. New York State Dep't of Correctional Serv.*, 180 F.3d 426, 436 (2d Cir.1999). Facts, inferences therefrom, and ambiguities must be viewed in a light most favorable to the nonmovant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Richardson*, 180 F.3d at 436; *Project Release v. Prevost*, 722 F.2d 960, 968 (2d Cir.1983). Once the moving party has met the initial burden of demonstrating the absence of a genuine issue of material fact, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56; *Liberty Lobby, Inc.*, 477 U.S. at 250, 106 S.Ct. 2505; *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Matsushita Elec. Indus. Co.*, 475 U.S. at 587, 106 S.Ct. 1348. At that point the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.*, 475 U.S. at 586, 106 S.Ct. 1348. To withstand a summary judgment motion, sufficient evidence must exist upon which a reasonable jury could return a verdict for the nonmovant. *Liberty Lobby, Inc.*, 477 U.S. at 248–49, 106 S.Ct. 2505; *Matsushi-*

*ta Elec. Indus. Co.*, 475 U.S. at 587, 106 S.Ct. 1348.

### B. The Counterclaim—Breach of Contract

■ In its counterclaim, Alcoa Inc. claims that Utica Alloys, Inc. breached the purchase agreement by refusing to pay the purchase agreement price for the scrap it shipped from February of 2002 to April 2002. The success of this claim revolves around the interpretation of the review clause, which as noted, states: "The pricing, servicing and processing will be reviewed approximately every six (6) months beginning in January 2002." (Docket No. 24, Ex. D.)

Utica Alloys, Inc.'s argument can be summarized as follows: The clause is ambiguous because it can be interpreted as either not granting or granting to either party a right to terminate the purchase agreement in the event the parties do not reach an agreement during the expressly provided for price review. Because the clause is ambiguous, it is proper to resort to extrinsic evidence to determine whether the parties intended through the clause to grant such a termination right. The extrinsic evidence establishes that such a right was, in fact, intended or, at the very least, that a factual question remains. Because of the desire not to penalize the party requesting a price review, the purchase agreement price was suspended during negotiations, and, when such negotiations failed, the termination of the agreement was effective as of date the price review was initially undertaken at the end of January of 2002. Alcoa Inc. claims the plain language of the review clause cannot be read to grant a right of termination in the event negotiations failed.

■ The goal of contract interpretation is "to give effect to the intention of the

parties as expressed in the unequivocal language employed." *Breed v. Ins. Co. of N. Amer.*, 46 N.Y.2d 351, 355, 413 N.Y.S.2d 352, 385 N.E.2d 1280 (1978). "Where the language of a contract is clear and unambiguous, it is to be interpreted by its own language," *S. Road Assocs., LLC v. Int'l Bus. Mach. Corp.*, available at 770 N.Y.S.2d 126, 128–29 (2d Dep't.2003), giving the words used "their plan meaning," *Krumme v. WestPoint Stevens*, 238 F.3d 133, 139 (2d Cir.2000). Extrinsic evidence outside " 'the four corners of the instrument' " may not be used to vary or alter this meaning. *British Int'l Ins. Co. Ltd. v. Seguros La Republica, S.A.*, 342 F.3d 78, 82 (2d Cir.2003) (quoting *Rainbow v. Swisher*, 72 N.Y.2d 106, 109, 531 N.Y.S.2d 775, 527 N.E.2d 258 (1988)). Where, however, contract language is ambiguous, extrinsic evidence can be accepted to help determine the true intentions of the parties. *Id.* (quoting *Alexander & Alexander Servs., Inc. v. Certain Underwriters at Lloyd's*, 136 F.3d 82, 86 (2d Cir. 1998)). "Whether a contract is ambiguous is a question of law for a court to determine as a threshold matter" on a case by case basis. *World Trade Ctr. Properties, LLC v. Hartford Fire Ins. Co.*, 345 F.3d 154, 184 (2d Cir.2003); *W.W.W. Assocs. v. Giancontieri*, 77 N.Y.2d 157, 162, 565 N.Y.S.2d 440, 566 N.E.2d 639 (1990).

▆▆▆ A contract provision is unambiguous when it has a "definite and precise meaning, unattended by danger of misconception in the purport of the contract itself, and concerning which there is no [reasonable] basis for difference of opinion." *Krumme*, 238 F.3d 133, 139 (2d Cir.2000). A contract is ambiguous where its terms "could suggest more than one meaning when viewed objectively by a reasonably intelligent who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *British Int'l*, 342 F.3d at 82 (internal quotations and citation omitted). However, just as extrinsic evidence may not be used to create an ambiguity in a contract, "[u]nambiguous contract language is not rendered ambiguous by competing interpretations of it urged in litigation." *Photopaint Technologies, LLC v. Smartlens Corp.*, 335 F.3d 152, 160 (2d Cir.2003).

As evidence that the review clause is ambiguous, Utica Alloys, Inc. points to the deposition testimony of one of its own employees, Charles Yarbrough ("Yarbrough"), who previously worked for other companies in the scrap metal business. Notwithstanding that Yarbrough could be considered biased because of his allegiance to plaintiff, his testimony is far less than a definitive statement that the review clause could be read to grant a termination right, much less a reasonable definitive statement. A large portion of the quoted testimony concerns his understanding of the purpose behind the clause—fairness for parties entering into purchase agreements the subject of which is subject to an unpredictable market—and his understanding that the clause implies a duty on the part of both parties to negotiate in good faith once a price review is requested, (Docket No. 23, pp. 11–12; Docket No. 25, Ex. D.), neither of which is relevant or contested by Alcoa Inc. The last, smaller portion of the quoted deposition testimony does relate to whether the clause grants a right to termination in the event negotiations fail, but Yarbrough himself notes that "it doesn't state .that," and that it is only implied, and at no point ever states that such implication comes from his experience in dealing with other, similar clauses in agreements with no separate termination clauses. Thus, a colorable argument exists that his reading of the clause comes not

from his industry experience in dealing with contracts like the one at issue here—i.e., one with no separate termination clause—but rather from reading only this contract, and from a biased perspective at that.

In any event, the language of the clause itself does not lend itself to differing reasonable interpretations. No terms of art are used that could denote a right to termination. The words used can be interpreted only to mean just what they say—that "[t]he pricing, servicing and processing will be reviewed approximately every six (6) months beginning in January 2002." (Docket No. 24, Ex. D.) Nothing in this language indicates, implicitly much less explicitly, that a lack of consensus on such a review results in the agreement ceasing to exist. Such an interpretation, which would permit a party to welch on its obligations if it simply did not get its way, so to speak, in the negotiations process, would be unreasonable, and could perhaps render the remainder of the terms of the contract superfluous.

Utica Alloys, Inc.'s only other substantive argument in this regard is that interpreting the clause to not grant a termination right would render it "without purpose." (Docket No. 23, p. 9.) Particularly, it claims that such an interpretation would mean that "the requesting party would be in the same position if the [review clause] was not contained in the . . . [p]urchase [a]greement—still able to request review and still without remedy if the request is not resolved—still required to perform, and accept performance required by" the agreement. *Id.* This argument is rejected. As noted, defendant does not appear to argue that the review clause does not impose a good faith negotiating duty on the parties when a review is requested. It only claims that a right to termination if those negotiations fail

cannot be read into the clause. Therefore, even though the review clause does not provide the parties guidance as to the contingency of failed negotiations, it does serve the purpose of permitting the negotiations themselves, and mandating a good faith effort by both sides. In the absence of the review clause Utica Alloys, Inc. would certainly have the *ability*—but not the *contractual right*—to request review. Thus, interpreting the review clause as not granting to the parties an implied right of termination does not render it without purpose.

If defendant had failed to negotiate in good faith, a claim neither made by Utica Alloys, Inc. nor supported by the record, plaintiff *may* have had the *option* to terminate the agreement. However, under the language in the agreement, prepared and/or approved by a vice president of Utica Alloys, Inc., it does not have the *contractual right* to terminate the agreement merely because the good faith negotiations are unsuccessful.

### C. Alcoa Inc.'s Damages

There is no dispute that Utica Alloys, Inc. did not pay the purchase agreement price, or any price for that matter, for the scrap shipped to it by defendant from February of 2002 to April of 2002. There can also be no dispute that Alcoa Inc. terminated the purchase agreement in May of 2002 because of this breach. The question remaining on the counterclaim, therefore, is the proper measure of damages. Defendant claims its measure of damages is the difference between the purchase agreement price of the scrap and the price for which it sold the processed scrap it retrieved from plaintiff.

This, however, would serve as a double penalty to Utica Alloys, Inc. for processing the scrap. Absent the purchase agreement, Alcoa Inc. would have sold the scrap

at the unprocessed market price. Because of the purchase agreement, it is entitled to the higher purchase agreement price. The processed feature of the scrap, as Alcoa Inc. points out numerous times, was not part of the agreement between the parties and actually decreased its value because of the demand reduction in the market for such scrap. However, Alcoa Inc. accepted return of the processed scrap from Utica Alloys, Inc. when it elected to terminate the purchase agreement in May 2002. It has also refused to pay plaintiff for processing the scrap. Defendant cannot be permitted in one breath to denounce processing as irrelevant to the contractual relationship, while in another embrace the market change of processed scrap as the yardstick for measuring its damages under the contract.

Therefore, the proper measure of damages is the difference between the purchase price of the unprocessed scrap, as such is calculated under the purchase agreement, and the market value of unprocessed scrap. The market value of unprocessed scrap is not to be determined solely from the amount for which Alcoa Inc. was able to sell the scrap in May of 2002. Rather, because the purchase agreement called for monthly shipments and prices, damages will have to be ascertained for three different time periods. The following determinations will therefore need to be made, for each of the months from February to April of 2002, before the proper amount of total damages can be calculated: (1) the amount, *in pounds*, of scrap shipped during each of the relevant months; (2) the per pound purchase agreement price, calculated *using the formula in the agreement*, for each of the relevant

months; and (3) the per pound *fair market value of unprocessed scrap* for each of the three months. The damages will be calculated for each of the three months, and will then be added together to determine defendant's total damages for plaintiff's failure to pay for the scrap it was shipped. The parties will be permitted to submit verified applications setting forth *only* the three *figures*, as well as any facts/figures supporting the same, required *for each month.*

### D. Utica Alloys, Inc.'s Claims

■■■ Contrary to defendant's argument, the fact that the parties had a contractual relationship from February of 2002 to May of 2002 does not automatically mean that plaintiff's *quantum meruit* and unjust enrichment claims fail. These two claims emanate from the charges Utica Alloys, Inc. incurred in processing the shipped scrap, which, as Alcoa Inc. has repeatedly pointed out, was an activity irrelevant to and outside the scope of the purchase agreement. The purchase agreement contemplated only the sale of unprocessed scrap from defendant to plaintiff. It did not provide for what plaintiff was to do with the scrap once delivered. Thus, plaintiff's two claims cannot be barred because of the existence of " 'a valid express agreement between the parties which explicitly covers the same specific subject matter for which the implied agreement is sought.' " *See Lightfoot v. Union Carbide Corp.,* 110 F.3d 898, 905 (2d Cir.1997) (quoting *Chadirjian v. Kanian,* 123 A.D.2d 596, 506 N.Y.S.2d 880, 882 (2d Dep't 1986)); *R.B. Ventures, Ltd. v. Shane,* 112 F.3d 54, 60 (2d Cir.1997). Nevertheless, the two claims are both legally deficient.[2]

---

**2.** Initially, it should be noted that the two claims are "quite properly subsumed by [a] district court into a single [claim] for restitution." *See Newman & Schwartz v. Asplundh*

*Tree Expert Co.,* 102 F.3d 660, 663 (2d Cir. 1996); *see also Cooper v. Salomon Bros. Inc.,* 1 F.3d 82, 86 (2d Cir.1993) ("Although the complaint itself fails to specify the basis for

### 1.. *Quantum meruit*

 In order to recover in *quantum meruit* for processing the scrap, Utica Alloys, Inc. must demonstrate that it had a reasonable expectation of being compensated. *See Moors v. Hall*, 143 A.D.2d 336, 532 N.Y.S.2d 412, 414 (2d Dep't 1988). Whether a plaintiff has satisfied this requirement is ordinarily a question for a jury. *Id.* Here, however, the facts alleged by plaintiff as serving the basis for satisfying the requirement are insufficient, as a matter of law, to demonstrate a reasonable expectation of compensation. Specifically, plaintiff points to the following alleged facts: (1) the alleged statement made by O'Leary in February of 2002 that Utica Alloys, Inc. should continue to process the scrap it is shipped during price review negotiations; and (2) the statements about the payment of processing charges during negotiations as part of the parties' efforts to come to a consensus.

With respect to the first alleged fact, plaintiff argues that a jury could find O'Leary's statement to be a request that it continue to process the scrap. This is rejected. O'Leary's statement, assuming he made it, was clearly just a signal that Alcoa Inc. wished to resolve the purchase price dispute and continue the contractual relationship. As both parties point out, under the purchase agreement Alcoa Inc. was unconcerned with what Utica Alloys, Inc. did with the scrap that was shipped.

O'Leary therefore would have had no motivation to make the statement other than to convey to plaintiff that Alcoa Inc. intended to make the good faith effort required during the negotiations process. It is important to note that the alleged statement was made in February of 2002, early in the negotiations process. Plaintiff did not yet have a large quantity of scrap stockpiled at its facility. It had not yet processed a large (or, most likely, any) amount of scrap such that it had to be then concerned about receiving compensation therefor. At that point in the negotiations, the only issue on the table was the purchase agreement price at which Utica Alloys, Inc. was to buy the scrap. There is no evidence that extra-contractual issues, such as processing charges, were being considered.

With respect to the second alleged fact, it is critical that the parties were negotiating, making various offers and counteroffers, at the time defendant made statements about the prospect of it paying plaintiff's processing charges. Alcoa Inc. does acknowledge that it raised the possibility of paying such charges, but only as a part of a larger offer to resolve the price review dispute. Utica Alloys, Inc. cannot derive a reasonable expectation of compensation from the characterization of part of a negotiation offer as acceptable and satisfactory. The April of 2002 offer, in which defendant's offer to pay the charges was included, was unquestionably rejected by

relief, the court interpreted his complaint as seeking restitution damages for unjust enrichment under a theory of quasicontract, in essence a claim for *quantum meruit* "). Indeed, the Second Circuit has attached identical proof requirements to both claims. *See Golden Pac. Bancorp v. F.D.I.C.*, 273 F.3d 509, 519 (2d Cir.2001) (unjust enrichment); *Fieger v. Pitney Bowes Credit Corp.*, 251 F.3d 386, 403 (2d Cir.2001) (*quantum meruit*). However, the proof requirements as stated in those cases do not explicitly include the requirement that a plaintiff must have a reasonable expectation of compensation for services rendered, which is critical to the success of a *quantum meruit* claim. *See Cooper*, 1 F.3d at 86 ("A plaintiff seeking quantum meruit must demonstrate ... that the one rendering the services [reasonably] expected to be paid therefor"); *see also Gidatex, S.r.L. v. Campaniello Imps., Ltd.*, 49 F.Supp.2d 298, 303 (S.D.N.Y.1999) ("A claim for *quantum meruit* requires plaintiff to show that it expected compensation; a claim for unjust enrichment does not"). Accordingly, the two claims will be analyzed separately.

plaintiff. It would be inappropriate to permit Utica Alloys, Inc. to manipulate negotiation statements, which by their very nature are contingent, into forming a reliable and reasonable basis for compensation. Such would thwart the purpose of negotiation, and would discourage parties from the good faith, back and forth, efforts that ordinarily resolve disputes outside of the courtroom. Therefore, on the facts alleged, Utica Alloys, Inc. did not, as a matter of law, have a reasonable expectation of compensation for the processing of the scrap.

### 2. *Unjust enrichment*

■ To prevail on its unjust enrichment claim, Utica Alloys, Inc. must prove, *inter alia*, that by processing the scrap, Alcoa Inc. was enriched when it retrieved the scrap in May of 2002. *See Golden Pac. Bancorp,* 273 F.3d at 519 ("Under New York law, for a plaintiff to prevail on a claim of unjust enrichment, he must establish: (1) that the defendant was enriched"). Utica Alloys, Inc. argues that "processing adds value to the [s]crap[,][and] allows a purchaser to obtain a chemical analysis thereof." (Docket No. 23, p. 24.)

There is no dispute that the market for the processed scrap was poor from February to April of 2002. Thus, far from being enriched, Alcoa Inc. actually suffered a loss by virtue of the processed feature of the scrap. In other words, had plaintiff not processed the scrap, and instead allowed defendant to retrieve it as it was shipped, Alcoa Inc. could have sold it at a higher price. That defendant allegedly requested and then received chemical analyses of the scrap speaks less to the fact that it felt enriched by the processing, and more to an attempt to try to make as marketable as possible scrap that it already knew was processed and would garner a lower purchase price. Therefore,

because Utica Alloys, Inc. cannot prove that Alcoa Inc. was enriched in any way by the processing efforts, the claim for unjust enrichment must fail.

## IV. CONCLUSION

The review clause in the purchase agreement entered into by and between Utica Alloys, Inc. and Alcoa Inc. cannot be read as conferring an implicit termination right, and is therefore unambiguous. Defendant is therefore entitled to judgment on its counterclaim, and may receive as damages for plaintiff's failure to pay for scrap shipped and received under the purchase agreement the difference between the monthly purchase agreement price for such scrap and the monthly fair market value of unprocessed scrap. Plaintiff's claims for *quantum meruit* and unjust enrichment fail as a matter of law.

Accordingly, it is

ORDERED that

1. Defendant's motion for summary judgment on plaintiff's claims is GRANTED, and the complaint is DISMISSED;

2. Plaintiff's cross-motion for summary judgment on defendant's counterclaim is DENIED; and

3. Defendant's motion for summary judgment on its counterclaim is GRANTED on the issue of liability.

Alcoa Inc. shall submit a verified application as to the three damages components for each month, as such components are set out herein. Said application shall be filed and served on or before February 24, 2004. Utica Alloys, Inc. may submit a verified opposition. Said opposition shall be filed and served on or before March 23, 2004. Thereafter, judgment will be en-

tered dismissing the complaint and on Alcoa Inc.'s counterclaim.

IT IS SO ORDERED.