**Gary F. BROCKETT, Plaintiff,**

v.

**UTICA BOILERS, INC.; Enviromaster International Corporation; and Utica Boilers, Inc. Profit Sharing Plan, Defendants.**

No. 5:00–CV–962.

United States District Court, N.D. New York.

Aug. 6, 2004.

Hancock & Estabrook, LLP, Syracuse, NY (Thomas C. Buckel, of counsel), for Plaintiffs.

Phillips Lytle LLP, Buffalo, NY (Gary F. Kotaska, Paul K. Stecker, of counsel), for Defendants.

### MEMORANDUM–DECISION and ORDER

HURD, District Judge.

## I.  INTRODUCTION

Plaintiff Gary F. Brockett ("Brockett" or "plaintiff") commenced the instant action, alleging: (1) entitlement to additional benefits under the Utica Boilers, Inc. Prof-

it Sharing Plan ("Plan") for years 1993–97, and to benefits for Plan year 1998, pursuant to the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001 *et seq.;* and (2) retaliation and various state law claims.  (Docket No. 1.)

Following partial reversal by the Second Circuit Court of Appeals, *Brockett v. Reed,* 78 Fed. Appx. 148, No. 02–9370, available at 2003 WL 22348898 (2d Cir. Oct.15, 2003), *aff'g in part, rev'g in part,* No. 5:00–CV–962, 2002 WL 31677019 (N.D.N.Y. Jul.12, 2002) ("*Brockett I* "), the remaining defendants and plaintiff moved again for summary judgment pursuant to Fed. R.Civ.P. 56.  Oral argument was heard on July 9, 2004, at Utica, New York. Decision was reserved.

## II.  BACKGROUND

This section of the decision details the factual background developed by the parties for the original summary judgment motions;  the relevant portions of the decision on those motions;  and the Second Circuit's partial reversal of the same.[1] The evidence submitted following remand is detailed *infra,* for the sake of coherency.

### A.  Factual Background Prior to Remand

Brockett, an engineer by training, co-founded defendant Enviromaster International Corporation ("EIC") in the mid–1980's.  After Utica Boilers, Inc. ("Utica Boilers") acquired EIC in 1988, he became a participant in the Plan. In 1993, a consultant recommended to Utica Boilers, which was the Plan Administrator, that the Plan be amended to provide for employer contributions at one of three rates, dependent upon a participant's classification in one of three categories.

---

1. Those facts and portions of the opinions relevant to conclusions that have not been disturbed by the Second Circuit will be omitted, to the greatest extent possible.

At a September 1993 meeting of the Utica Boilers Board of Directors ("Board"), Brockett was appointed President of EIC. Immediately thereafter, the Board authorized amendment of the Plan to provide for three separate employee classifications—*Class A, Class B,* and *Class C. Class A* participants would receive yearly employer contributions to their Plan accounts in the amount of $30,000. *Class B* members would receive yearly contributions in the amount of 15% of their annual compensation. And *Class C* members would receive contributions in the amount of 7% of their annual compensation.

The Board specifically resolved that Utica Boilers President Earle C. Reed ("E.Reed") and Utica Boilers Vice President Richard Hilton ("Hilton") were members of Class A, and Tim Reed ("T.Reed") and James Benson ("Benson") were members of Class B. All other employees eligible for the Plan were to comprise Class C. The Board reserved to itself the power to make any future classifications, but delegated the power to implement the plan to E. Reed and Hilton.

On November 14, 1994, Hilton signed the amended Plan, which was made effective retroactively to January 1993, on behalf of Utica Boilers. Three classifications were indeed stated in the Plan, but under different names than adopted at the Board meeting. In descending order, from highest to lowest employer contributions, the classifications in the amended Plan were titled (1) *"Executive Management Employees,"* (2) *"Senior Management Employees,"* and (3) *"All Other Eligible Employees."* The amounts of required contributions, as stated in the Board resolution, remained the same, $30,000, 15% of annual compensation, and 7% of annual compensation. The classifications were neither defined nor limited anywhere in the Plan documents.

On November 6, 1998, Brockett was given the option of resigning in exchange for a severance package. The severance package included a provision that plaintiff's participation in the Plan would continue through 1998. He accepted the option.

His benefits for Plan years 1993–97 were thereafter calculated using the 7% employer contribution rate for participants classified in the "All Other Eligible Employees" category, and his account was credited with no employer contributions for Plan year 1998, in accordance with Plan provisions stating that the same are not required in the Plan year in which a participant ceases employment.

By letters dated July 13, 1999, and August 11, 1999, Brockett informed John Lauchert ("Lauchert")[2]—who was responsible for responding to benefit claims under the Plan—of his belief that his contributions were calculated incorrectly at 7% of his annual compensation, and that he was entitled to additional benefits. Brockett expressed his belief that, as President of EIC, he was entitled to classification in the "Executive Management Employees" category, which as noted would have entitled him to annual employer contributions of $30,000. He also noted that the severance package promised his continued participation in the Plan, such that he was entitled to contributions for Plan year 1998 as well.

By letter dated September 9, 1999, Lauchert denied Brockett's request for additional contributions. To interpret "Executive Management Employees," since

---

**2.** Lauchert was the Vice President for Finance for ECR International, Inc., which was the name of the surviving company after Utica Boilers merged with Dunkirk Radiator Corporation in June 1999.

the phrase was not defined in the Plan, Lauchert relied on the minutes of the September 1993 Board meeting. He noted that the Board was obviously aware of Brockett's position since it had appointed him to the same just before adopting the three classifications. He concluded that, since the Board had not specifically named him as a Class A or Class B member, it was proper to calculate his employer contribution rate at 7% for Plan years 1993–97. He also indicated that, because Plan documents provide that no employer contributions are required for the Plan year in which employment ceases, Brockett was entitled to no contributions for Plan year 1998.

Further correspondence between Brockett or his attorneys and Lauchert ensued, with neither side materially changing positions.

### B. Procedural Background

On June 19, 2000, Brockett filed this suit, alleging, *inter alia,* he should have been classified as an "Executive Management Employee" and, therefore, was entitled to an employer contribution of $30,000 per year from 1993 through 1998. He calculated that the shortfall to his Plan account—i.e., the difference between the 7% yearly contribution he received and the $30,000 contribution he should have received—was $131,650.37, exclusive of interest thereon.

### 1. Brockett I

On August 31, 2003, Brockett filed a motion for partial summary judgment. On September 4, 2001, defendants filed a motion for summary judgment. Oral argument was heard on the motions on October 12, 2001.

By Memorandum–Decision and Order dated July 12, 2002, *Brockett I, supra,* it was determined that the three classifications in the Plan were ambiguous. It was found that the minutes from the September 1993 Board meeting did not conclusively define the classifications because the Plan ultimately adopted used different titles and, unlike the Board resolution, did not expressly name any persons as members of any classification. Because the plan was ambiguous, however, the interpretation of the classifications was judged by an arbitrary and capricious standard, and reliance on the meeting minutes, and the resulting interpretation by Lauchert that Brockett was properly classified in the "All Other Eligible Employees" category, was held not to be improper. Thus, defendants' motion for summary judgment was granted for Brockett's claims for additional benefits for Plan years 1993–97.

While the Plan documents provided that no contributions were required to be made in the year in which a participant ceased employment, it was held that the severance package, by providing for continued participation for Plan year 1998, constituted an unambiguous agreement to vest benefits enforceable under ERISA.[3]

### 2. Second Circuit's Decision

The Second Circuit reversed and remanded. *Brockett,* 78 Fed.Appx. 148. The court first noted that, because the Plan does not reveal "whether [EIC] officers should be treated similarly to their counterparts at [Utica Boilers] or as subordinate to them," the classifications were ambiguous and the arbitrary and capricious standard applied to Lauchert's determination. *Id.* at 150. It then rejected two of defendants' arguments on the basis of

---

**3.** Summary judgment was also granted to the individual defendants on all claims, and to defendants on retaliation and state law claims. These holdings have not been disturbed by the Second Circuit and will not, therefore, be discussed.

the record being insufficient. First, the court noted that, while the September 1993 meeting minutes do provide that four specifically named individuals are to be in Class A and Class B, "[t]he record ... does not reveal whether the intent of the settlors was to allocate membership within each category by title, by individual, by salary, or by some other method not now apparent." *Id.* at 151.

Second, the panel found the record insufficient to address whether certain Plan language—that "Employees shall be treated as employed by a single Employer"— compelled classification on a participant's status within Utica Boilers, or with EIC. Specifically, the court stated:

> Whether this language suggests that employees with identical titles at two different arms of the corporation should be treated similarly under the Plan depends on other evidence not in the record before us. For example, if the officers of Utica Boilers are in other ways more handsomely compensated than their counterparts at EIC, or if EIC were shown to be merely one star in a constellation of Utica Boilers' holdings, the Plan could more reasonably be interpreted in the manner that Defendants urge.

*Id.* Accordingly, the court remanded for further development of the record and reassessment, in light of the additional evidence, of Lauchert's determination.

The Second Circuit did not, however, disturb the holding that the severance package, by offering Brockett continued participation in the Plan for 1998, constituted an unambiguous promise to vest benefits, enforceable under ERISA.

## III. *DISCUSSION*

### A. *Summary Judgment Standard*

Summary judgment must be granted when the pleadings, depositions, answers to interrogatories, admissions and affida-vits show that there is no genuine issue as to any material fact, and that the moving party is entitled to summary judgment as a matter of law. Fed.R.Civ.P. 56; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Richardson v. N.Y. State Dep't of Corr. Servs.*, 180 F.3d 426, 436 (2d Cir. 1999). Facts, inferences therefrom, and ambiguities must be viewed in a light most favorable to the nonmovant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

Once the moving party has met the initial burden of demonstrating the absence of a genuine issue of material fact, however, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56; *Anderson*, 477 U.S. at 250, 106 S.Ct. 2505. At that point, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec.*, 475 U.S. at 586, 106 S.Ct. 1348. Indeed, to withstand a summary judgment motion, the nonmoving party must demonstrate that sufficient evidence exists upon which a reasonable jury could return a verdict in its favor. *Anderson*, 477 U.S. at 248–49, 106 S.Ct. 2505; *Matsushita Elec.*, 475 U.S. at 587, 106 S.Ct. 1348.

### B. *Preliminary Issues*

Prior to analyzing whether the additional evidence submitted by the parties helps to answer the questions identified by the Second Circuit as necessary to determining whether Lauchert's determination was arbitrary and capricious, some preliminary matters must be addressed.

### 1. *Failure to Amend the Complaint*

Brockett received employer contributions at a rate of 7% of his annual compensation for Plan years 1993–97, and

no contributions for Plan year 1998. As noted, in the complaint and original summary judgment motion, he sought, for 1993–98, the difference between that amount and the $30,000 per year in employer contributions to which he claimed entitlement as a member of the "Executive Management Employees" classification. Following remand, however, Brockett now seeks: (1) no additional contributions for Plan year 1993; (2) the difference between the contributions made to his account for Plan years 1994–95 and contributions for the same period based on a 15% contribution rate; and (3) the difference between the contributions made to his account for Plan years 1996–98 and contributions for the same period based on a $30,000 contribution rate.

Rather than not pass upon the pending motions because of Brockett's failure to amend the complaint to reflect this shift, it is more prudent to consider portions of his original claims abandoned. Permitting such modification at this point does not prejudice defendants, who have continually maintained that plaintiff was entitled to no greater than a 7% employer contribution rate for all years. Further, because Lauchert specifically found that the 7% rate was appropriate, the fact that plaintiff seeks placement in the "Senior Management Employees" classification for 1994–95 instead of the "Executive Management Employees" classification does not negatively implicate any exhaustion of remedies issue.

### 2. *Expansion of the Administrative Record*

Likewise, though defendants claim it improper to consider any evidence beyond that which Lauchert had before him, the Second Circuit—by holding that the major questions relevant to assessing his determination could not be answered because of an insufficient record—felt the administrative record should, and must, be expanded to include additional evidence. Such evidence, which most prominently pertains to the intent of the Board in creating or changing the classifications, will then be considered in determining whether Lauchert's decision was arbitrary and capricious.

### C. *Evidence Developed Following Remand*

As noted, the Second Circuit held that Lauchert's determination that Brockett was properly classified in the "All Other Eligible Employees" category, and therefore entitled to only a 7% employer contribution rate, could not be assessed on the record developed to that point, without further evidence: (1) of the Board's intent as to how classification decisions were to be made, and (2) regarding whether the Plan could be interpreted to limit membership in the highest two classifications to only Utica Boilers' employees. The issues will be addressed in reverse-order.

Following remand, both plaintiff and defendants purported to submit evidence relevant to these issues. Of particular help in resolving the pending summary judgment motions are affidavits submitted by defendants of three individuals—Lauchert, E. Reed, and Stephen Sweet (another Board member) ("Sweet").

### 1. *The Top Two Classifications Were Not Limited to Utica Boilers' Employees*

█ The Second Circuit was unable to determine on the record before it whether the Plan could be reasonably interpreted to limit membership in the top two classifications to only Utica Boilers' employees.[4] Regardless of the method by which

---

4. The panel noted that the Plan "could" be interpreted to contain this restriction if evidence was presented that EIC was "merely

classification decisions were made, if membership in the "Executive Management Employees" and "Senior Management Employees" categories was restricted in such a way, Brockett was not, at any point from 1994–98, entitled to either a $30,000 annual contribution or a contribution of 15% of his annual compensation. While it is undisputed that neither the September 1993 Board resolution nor the Plan itself stated that only Utica Boilers' employees were eligible for membership in the top two classifications, Lauchert in his affidavit purports to claim that such a restriction was intended, arguing that E. Reed informed him of the same in a conversation the two allegedly had after Brockett filed his claim for additional benefits. (Docket No. 87, Attach. 2, ¶ 13.)

This, however, does not square with E. Reed's affidavit or, more importantly, with Lauchert's own prior statements in letters to Brockett. Nowhere does E. Reed, who claimed in his affidavit that he provided Lauchert "with the same information set out herein as to my intention, and my understanding of the Board's intention, regarding which individuals would receive contributions at the $30,000 per year, 15% of compensation, and 7% of compensation levels," (Docket No. 87, Attach. 4, ¶ 36), state or even reference this alleged restriction. Lauchert himself, in his two denial letters to Brockett, never gave as a reason for the denial the fact that Brockett was an employee of EIC and not Utica Boilers, which would have been a simple, straightforward reason for the denial. Instead, Lauchert in the letters went into a long, detailed explanation for the denial—which never once mentioned Brockett's EIC employment. The closest he comes to the issue is a statement, echoed by E. Reed, that "[EIC] employees participate in the

Utica Boilers Profit Sharing Plan," (Docket No. 87, Attach. 2, Ex. C; Docket No. 87, Attach. 4, ¶ 10), which, if anything, indicates that under the Plan EIC and Utica Boilers employees were to be treated alike. Therefore, there is no credible evidence in the record to establish that membership in the "Executive Management Employees" and "Senior Management Employees" classifications was, or was intended to be, restricted to only Utica Boilers' employees.

### 2. Board's Intent Regarding Classification Method

██ As noted, the Second Circuit held that Lauchert's determination that Brockett was properly classified in the lowest classification could also not be assessed on the record developed to that point without further evidence of the Board's intent as to how classification decisions were to be made. The panel offered up some possibilities as to the method of classification—salary, title, individual—but noted that the listing was non-exclusive.

Brockett has filed detailed information with respect to his salary as compared to E. Reed, T. Reed, Benson, and other Plan participants. He also highlighted various statements issued by Board members and others opining that he performed superbly in his duties, and filed submissions purporting to show the various financial and production-related headway EIC made after he was appointed as its President. Also now in the record are various pieces of evidence allegedly demonstrating that plaintiff had substantial responsibilities and duties. None of these submissions, however, directly indicate that it was the Board's intention that these factors—salary, title, performance, duties—influence the classification decision.

one star in a constellation of Utica [Boilers'] holdings." *Brockett,* 78 Fed.Appx. at 151. Defendants do not claim that this is the case,

or that Utica Boilers viewed EIC as an unimportant arm of the corporation.

Lauchert, citing his alleged 1999 conversation with E. Reed,[5] claims he was informed that the identity of individuals eligible for membership in the "Executive Management Employees" and "Senior Management Employees" classifications was fixed in the Board resolution, and that there was no intention to change that in the future. (Docket No. 87, Attach. 2, ¶ 10). Lauchert also implied, this time without citing his alleged discussion with E. Reed, that salary was a factor in the classification decision. *Id.* ¶ 15 (stating he "learned that at the time the Board decision was made in 1993 Mr. Brockett['s] ... compensation was far less than any of the four persons designated to be in the $30,000 or fifteen percent (15%) of compensation contribution classes").

E. Reed, however, does not indicate in his affidavit that a participant's salary had significant impact on the initial classification decision.[6] The only factor he seems to suggest specifically influenced the initial classification decision was an individual's name—particularly, he and other Board members "understood at the September 29, 1993 meeting that [they] were fixing the identity of the persons who would occupy each of the three categories that the ... Plan would establish for contribution purposes." (Docket No. 87, Attach. 4, ¶ 18.) He also points out, in response to

an argument made by Brockett, that EIC's financial situation in 1993–94 precluded Brockett's placement in a higher classification. *Id.* ¶ 27. Thus, according to E. Reed, *initial* classification decisions were made by an individual's title—if a participant was not explicitly named in the Board resolution as a member of the "Executive Management Employees" or "Senior Management Employees" classification, he or she was automatically relegated to the "All Other Eligible Employees" classification—and, perhaps indirectly, by the financial stability of the entity over which the participant had control.

As noted, Brockett is not now seeking additional employer contributions for 1993. In other words, he has abandoned any challenge to the Board's initial decision to place him into the "All Other Eligible Employees" classification. Therefore, his challenge is that it was improper for the Board not to upgrade his classification after 1993, and that Lauchert's determination, in failing to recognize that fact, was arbitrary and capricious.[7]

What E. Reed made implicit about financial success bearing on the *initial* classification decision, he attempted to make explicit about its importance in *changing* a participant's classification at some later point. *Id.* ¶ 31 (rejecting Brockett's argu-

---

**5.** Lauchert was not employed by EIC or Utica Boilers at the time of the September 1993 Board meeting or the formation of the Plan documents.

**6.** The evidence does seem, nevertheless, to show some disparity in compensation between Brockett and the named members of the top two classifications, though the degree of the same does not appear to be as significant as defendants make it. Construing the facts in Brockett's favor, this is especially so if what he claims is the difference between his salary and the next-lowest salary of a Plan participant is accepted as true. Even if the salary gap between Brockett and the members of the "Executive Management Employ-

ees" and "Senior Management Employees" classifications was significant in the initial classification decision, it has not been stated by any Board member to be the method by which changes in classification were made, which is the relevant inquiry here. *See infra.*

**7.** As noted, *supra,* this does not present any conflict with Brockett's duty to exhaust his administrative remedies, as the challenge to the refusal to change his classification is simply a more specific and refined subset of the overall claim he made to Lauchert, who determined that he was not entitled to more than a 7% employer contribution for *any* Plan years.

ment that he should have been classified higher for exceptional performance because EIC "did not have any operating profit for any two consecutive years"). Sweet, another Board member, appears to concur with this factor taking on paramount importance in reassessments of plaintiff's classification. Particularly, Sweet claimed that if plaintiff had been recommended for membership in the "Executive Management Employees" or "Senior Management Employees" classification, he would have objected because of "the failure of [EIC], through the term of Mr. Brockett's term of President of that corporation, to be [sic] produce consistent operating results that reflected the millions of dollars that had been invested in and/or loaned to that corporation by Utica Boilers." (Docket No. 87, Attach. 3, ¶ 16.)

That Brockett was not considered for an upgrade in classification because of EIC's financial situation, however, does not appear to square with a decision to upgrade the classification of two of the original four top level Plan participants. Specifically, in late 1995, T. Reed and Benson had their classification changed from "Senior Management Employees" to "Executive Management Employees." Although the Plan requires Board approval to upgrade an individual's classification, no Board approval was made in the cases of T. Reed and Benson. In his affidavit, E. Reed states that he certainly made a recommendation regarding the upgrades, but has "no clear recollection" whether he made a formal presentation to the Board, though it is his "belief" that he did, and that it is his "belief" that the Board had formally acted. (Docket No. 98, ¶¶ 11–13.) He blames the absence of evidence of formal action on the shifting of minute-preparing duties from him to T. Reed at the end of 1995. *Id.* ¶ 14. In the face of litigation, such an explanation is insufficient. Otherwise, the failure of the Board to act could always be retroactively corrected. Under these cir-

cumstances, the fact that Brockett never received formal Board approval for an upgrade—or, indeed, never even received the consideration that would have prompted a definitive decision—is not fatal to his claim.

As expected, Brockett goes to some length in describing the lack of formality, procedure, and documentation involving the decision to upgrade T. Reed's and Benson's classification, even describing it as the uninformed whim of E. Reed. The validity of this position need not be addressed, however, because E. Reed's second affidavit, submitted by defendants in response to this very argument, asserts the lone, rather simple reason the decision was made. It should first be noted that, while the upgrade in classification was contemporaneous with T. Reed assuming the Presidency of Utica Boilers, Benson's position did not change, thus an individual's title alone was not the method by which the Board upgraded classifications. Rather, E. Reed claims the change to "Executive Management Employees" classification for both of these individuals came about, simply put, as an outgrowth of the Board's informal determination that both individuals *"should have increased management responsibilities."* (Docket No. 98, ¶¶ 10–12) (emphasis added).

Thus, we are left with two separate factors tied into the decision to upgrade or not upgrade a participant's classification: (1) the financial success of the entity over which a participant has charge or control, and (2) the level of a participant's management responsibilities. It should first be noted that these two factors are, by the account of E. Reed and Sweet, mutually exclusive. Nothing suggests that Brockett's managerial responsibilities had any influence on the decision not to upgrade his classification (or, perhaps more appropriately, not to even consider it), and E.

Reed made no suggestion that T. Reed's and Benson's upgrade in classification had anything to do with the financial success of the companies or divisions over which they had control. Simply put, it is one or the other.

Putting aside this inherent contradiction in the statements of E. Reed, a simple analysis of the two reasons reveals which is more credible. The first—financial success or stability—was advanced *ad hoc* to support a litigation position. E. Reed has admitted, repeatedly, that the subject of an upgrade in Brockett's classification simply never arose. Thus, any reason advanced is necessarily speculative and is not, in fact, the actual reason for the decision because there never was a decision in the first place. The reason is what E. Reed claimed it would have been had the issue been addressed.

On the other hand, the second—increased management responsibilities—was a reason given for a specific decision that was actually made. E. Reed was not hypothesizing as to why T. Reed and Benson were upgraded; he was stating as a matter of fact why that specific decision was made. Thus, per the mandate of the Second Circuit, one need look no further than the specific upgrade in classification to T. Reed and Benson to discern the Board's intention as to the method by which a participant's classification was to be changed. Their classifications were actually upgraded in 1996 based upon *their* management responsibilities. From the record as further developed, this was the "other method not now apparent" to which the Second Circuit referred. *Brockett*, 78 Fed.Appx. at 151. Therefore, Brockett's classification after 1993 should have been based upon *his* management responsibilities.

### D. Brockett's "Management Responsibilities"

■ Given the breadth and depth of the parties submissions, evidence of Brockett's specific management responsibilities is surprisingly scant. However, there has been deposition testimony in this case that has compared his responsibilities to those of other major figures who are or were members of higher classifications. In his statement of material facts, plaintiff refers to a portion of Hilton's deposition in which it is stated that his placement in the "All Other Eligible Employees" classification was unfair in 1994 because "[h]is responsibilities were equal to any of the other people [i.e. T. Reed and Besnon] getting the 15 percent." (Docket No. 66, ¶ 48; Docket No. 77, Attach. 1, Hilton Dep., p. 80.) Defendants, while pointing out that Hilton did not think it contrary to the Plan terms to place Brockett in the third classification, do not deny his statement about the equality of responsibility. (Docket No. 97, ¶ 66.)

Again in his statement of material facts, Brockett refers to the deposition of Dave Abelove ("Abelove"), a member of the committee responsible for setting the compensation of top figures in the company, including Brockett. Specifically, though said in response to a question about compensation, Abelove stated that, during Plan years, plaintiff's "responsibilities were just as great" as other Utica Boilers upper-level employees, and his "responsibilities were similar" to T. Reed's. (Docket No. 66, ¶ 59; Docket No. 81, Attach. 2, Abelove Dep., pp. 21, 48.) Defendants deny both allegations, stating that Abelove is only one member of the committee whose views are "contradicted by Mr. Sweet in his affidavit." (Docket No. 97, ¶ 59.) The paragraphs of Sweet's affidavit to which defendants refer do not contradict Abelove's statement regarding plaintiff's responsibil-

ities, and instead consist of Sweet's view that plaintiff's compensation should not have been equivalent to the same for Utica Boilers' executives because of the differences in financial success between the two entities. (Docket No. 87, Attach. 3, ¶¶ 11–12.)

Thus, though the precise managerial responsibilities of Brockett are not known, it is known that, in 1994, at the very least they were equal or similar to the managerial responsibilities of T. Reed and Benson. At all times, both of these individuals held one of the top two classifications. Thus, taking into consideration the additional evidence mandated by the Second Circuit, Lauchert's determination that Brockett was properly placed in the lowest classification, "All Other Eligible Employees," for Plan years 1994–98 was arbitrary and capricious.

### E. Remedy

■ Since Brockett's managerial responsibilities were equal or similar to those of T. Reed and Benson in 1994, at that time he should have been upgraded to the "Senior Management Employees" classification. Further classification upgrade is inappropriate.

It is not known to which precise Plan years Abelove was referring when he testified that Brockett's responsibilities were "just as great" or "similar." It is known, however, that as of 1996, the Plan year in which their classification upgrades were effective, T. Reed and Benson had taken on "increased" management responsibilities. Brockett does not offer any evidence to dispute this allegation, and none has been found. He also does not claim that he, too, saw an increase in his management responsibilities at any time from 1995 to 1998. Therefore, plaintiff's proper placement, based upon the factor identified by E. Reed to control upgrade decisions, was in the "Senior Management Employees"

classification for Plan years 1994–98. As such, he was entitled to annual employer contributions in the amount of 15% of his salary for those years.

### IV. CONCLUSION

In light of the evidence developed after remand, per the mandate of the Second Circuit, Lauchert's determination that Brockett was properly placed in the "All Other Eligible Employees" classification for Plan years 1994–98 was arbitrary and capricious. His significant management responsibilities for all those years demanded that, after Plan year 1993, he be reclassified in the "Senior Management Employees" classification.

Accordingly, it is

ORDERED that

1. Defendants' motion for summary judgment is DENIED;

2. Plaintiff Gary Brockett's motion for summary judgment is GRANTED in part and DENIED in part, as follows:

a. GRANTED to the extent it sought "Senior Management Employees" classification for Plan years 1994–95;

b. DENIED to the extent it sought "Executive Management Employees" classification for Plan years 1996–98;

c. GRANTED as to the "Senior Management Employees" classification for Plan years 1996–98; and

3. Plaintiff Gary Brockett is entitled to the difference between the employer contributions he received for Plan years 1994–98, and the employer contributions he would have received had he been properly reclassified in the "Senior Management Employees" classification for those Plan years.

Plaintiff is directed to file and serve, on or before August 20, 2004, a verified application setting forth the amount due him in

accordance with this opinion. Verified opposition, if any, must be filed and served on or before September 10, 2004. In the alternative, the parties may stipulate, without any submission by either side, as to the amount due plaintiff in accordance with this opinion. The application or stipulation will be taken on submit and the Clerk will be directed to enter an appropriate judgment thereafter.

IT IS SO ORDERED.